The Honorable Helen CHENOWETH, the Honorable Bob Schaffer, the Honorable Don Young, and the Honorable Richard W. Pombo, all in their official capacities, Appellants,

v.

William J. CLINTON, President of the United States, Kathleen A. McGinty, Chair of the Council on Environmental Quality, individually and in their official capacities, and the United State of America, Appellees.

No. 98–5095.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 29, 1999.

Decided July 2, 1999.

William Perry Pendley argued the cause and filed the briefs for appellants. Todd S. Welch entered an appearance.

Ethan G. Shenkman, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were Lois J. Schiffer, Assistant Attorney General, and Martin W. Matzen, Attorney. Jared A. Goldstein, Attorney, entered an appearance.

Before: EDWARDS, Chief Judge, GINSBURG and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

Opinion concurring in the judgment filed by Circuit Judge TATEL.

GINSBURG, Circuit Judge:

Appellants Helen Chenoweth, Bob Schaffer, Don Young, and Richard W. Pombo, all of whom are Members of the United States House of Representatives, sued to enjoin implementation of President Clinton's American Heritage Rivers Initiative (AHRI). They claimed the President's creation of the program by executive order exceeded his statutory and constitutional authority. Characterizing the Representatives' claim as a "generalized grievance[ ] about the conduct of government," the district court held the plaintiffs lacked standing to sue and dismissed their complaint. The Representatives now appeal, arguing that the district court failed properly to apply our decisions in

*Kennedy v. Sampson,* 511 F.2d 430 (1974), and *Moore v. U.S. House of Representatives,* 733 F.2d 946 (1984). In part based upon the intervening decision in *Raines v. Byrd,* 521 U.S. 811, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997), we affirm the judgment of the district court.

## I. Background

The President announced his intention to create the AHRI in his 1997 State of the Union address. Soon afterward, the Council on Environmental Quality published a notice describing the program. Under the AHRI, it explained, federal agencies would be called upon to provide support for local efforts to preserve certain historically significant rivers and riverside communities. *See* 62 Fed.Reg. 27,253 (May 19, 1997). In June, 1997 Representatives Chenoweth, Schaffer, and Pombo introduced a bill "[t]o terminate further development and implementation" of the AHRI. H.R. 1842, 105th Congress. The bill never came to a vote. The President formally established the AHRI by executive order in September, 1997. *See* Exec. Order 13,061, 62 Fed.Reg. 48,-445.

Their legislative efforts having failed, the appellants brought this lawsuit, claiming the AHRI violates the Anti–Deficiency Act, 31 U.S.C. § 1301 *et seq.,* the Federal Land Management and Policy Act, 43 U.S.C. § 1701 *et seq.,* the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.,* and the Commerce, Property, and Spending Clauses of, and the Tenth Amendment to, the Constitution of the United States. According to the complaint, the President's issuance of the AHRI by executive order, without statutory authority therefor, "deprived [the plaintiffs] of their constitutionally guaranteed responsibility of open debate and vote on issues and legislation" involving interstate commerce, federal lands, the expenditure of federal monies, and implementation of the NEPA. The Representatives sought a declaration that the issuance of the AHRI

was unlawful and an injunction against its implementation.

The district court granted the President's motion to dismiss, concluding that the injury the Representatives claim to have suffered—the deprivation of their right as Members of the Congress to vote on (or, more precisely, against) the AHRI—is "too abstract and not sufficiently specific to support a finding of standing." The Representatives then took this appeal.

## II. Analysis

■ The Representatives' claim of standing is predicated upon the theory that by issuing Executive Order 13,061, the President denied them their proper role in the legislative process and, consequently, diminished their power as Members of the Congress. They rely primarily upon *Moore,* in which we held that the infringement of a legislator's "right[ ] to participate and vote on legislation in a manner defined by the Constitution" is an injury sufficiently direct and concrete to support the legislator's standing to sue. 733 F.2d at 951. To understand why their facially plausible argument is unpersuasive, some background is necessary.

■ The general principle that governs our standing analysis is firmly established: A federal court cannot, consistent with Article III, exercise jurisdiction over a lawsuit unless the plaintiff has suffered a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Application of the general rule to a Member of the Congress who objects to the actions of other participants in the legislative process, however, is a subject upon which this court has not spoken with great clarity.

Historically, political disputes between Members of the Legislative and the Executive Branches were resolved without re-

sort to the courts. *See Raines,* 521 U.S. at 826–28, 117 S.Ct. 2312 (describing conflicts between Congress and various Presidents decided in the political arena). When Members of the Congress first began to seek judicial relief from allegedly illegal executive actions that impaired the exercise of their power as legislators, however, we were initially receptive to the idea that we had jurisdiction to hear their complaints. In *Kennedy,* for instance, we found that a United States Senator had standing to challenge the President's pocket veto of legislation that both Houses of the Congress had approved. The allegedly unlawful veto, we reasoned, injured the Senator in a direct and personal way because it effected a "diminution of congressional influence in the legislative process." 511 F.2d at 435. On the same theory, we held that a group of Senators had standing to sue the President for depriving them of a constitutionally-mandated opportunity to vote on the abrogation of a treaty. *See Goldwater v. Carter,* 617 F.2d 697, 702 (en banc), *vacated on other grounds,* 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979).

After we decided *Kennedy,* however, the Supreme Court began to place greater emphasis upon the separation of powers concerns underlying the Article III standing requirement. *Compare Flast v. Cohen,* 392 U.S. 83, 100, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) ("The question whether a particular person is a proper party to maintain [an] action does not, by its own force, raise separation of powers problems"), *with Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (standing requirement "founded in concern about the proper—and properly limited—role of the courts in a democratic society"), *and Allen v. Wright,* 468 U.S. at 752, 104 S.Ct. 3315 ("[T]he law of Art. III standing is built on a single basic idea—the idea of separation of powers"). In decisions following *Kennedy* we noted that those concerns are present—indeed, are particularly acute—when a legislator attempts to bring an essentially political dispute into a judicial forum. Accordingly, in *Riegle v. Federal Open Market Committee,* 656 F.2d 873 (1981), we dismissed the complaint of a Senator who challenged the constitutionality of procedures by which certain members of the FOMC were appointed; this result, we held, was necessary in order to avoid an "obvious intrusion by the judiciary into the legislative arena." *Id.* at 881. We did not, however, disavow the standing analysis of *Kennedy* and *Goldwater.* Instead, creating a doctrine of "circumscribed equitable discretion," we held that the court would decline to hear the complaint of a Congressman who "could obtain substantial relief from his fellow legislators" regardless whether he had standing to sue. *Id.* Keeping distinct our analysis of standing and our consideration of the separation of powers issues raised when a legislator brings a lawsuit concerning a legislative or executive act, we concluded, made consonant two otherwise irreconcilable principles: first, that congressional and private plaintiffs should be treated alike for the purpose of determining their standing, and second, that courts should refrain from interfering in disputes arising out of the legislative process when a political remedy is available from within that process. *See id.* at 877–82.

But the circle did not long stay squared. Observing that jurisdictional issues such as standing are not of a sort usually committed to the discretion of courts, *see Moore,* 733 F.2d at 962 (Scalia, J., concurring), we questioned *Riegle* as frequently as we applied it. *See, e.g., Humphrey v. Baker,* 848 F.2d 211, 214 (1988) (concerns about the doctrine of equitable discretion "continue to trouble us"); *Melcher v. Federal Open Market Comm.,* 836 F.2d 561, 565 n. 4 (1987) (expressing doubt as to continuing viability of doctrine). The practical significance of *Riegle* was also open to question: With one exception, namely, *Bliley v. Kelly,* 23 F.3d 507, 510 (1994), every decision in which we applied the doctrine of equitable discretion was either reversed upon another jurisdictional ground by the Supreme Court, *see Barnes v. Kline,* 759

F.2d 21 (C.A.D.C.1985), *vacated sub nom. Burke v. Barnes*, 479 U.S. 361, 107 S.Ct. 734, 93 L.Ed.2d 732 (1987), or reached the same result that would have obtained had we treated separation of powers concerns as part of our inquiry into the plaintiff's standing. *See, e.g., Moore*, 733 F.2d at 956; *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1175 (1982). In *Moore*, for instance, we held that although congressmen had standing to object to the purportedly unconstitutional origination of a revenue-raising bill in the Senate, the district court properly dismissed their complaint under *Riegle* because their "rights [could] be vindicated by congressional repeal of the [offending] statute." 733 F.2d at 956. Our conclusion that the plaintiffs had standing to sue, in other words, got them into court just long enough to have their case dismissed because of the separation of powers problems it created. Recognizing the limited impact of the *Riegle* doctrine, we noted in *United Presbyterian Church v. Reagan*, 738 F.2d 1375 (D.C.Cir.1984), that "[i]t seems ... inconvenient ... to distinguish between those legislator claims that lack standing, and those that should be denied a favorable exercise of remedial discretion for reasons generally indistinguishable from those that underlie the doctrine of standing." *Id.* at 1382.

So matters stood when the Supreme Court recently decided *Raines v. Byrd*. The plaintiffs in that case were congressmen who objected to the Line Item Veto Act, which gave the President the authority to "cancel" spending provisions in an appropriations bill without vetoing the bill in its entirety. According to the plaintiffs, the Act injured them by "alter[ing] the legal and practical effect of all votes they ... cast on bills containing ... separately vetoable items," thus "divest[ing them] of their constitutional role" in the legislative process. 521 U.S. at 816, 117 S.Ct. 2312. The district court found that the plaintiffs had standing, citing *Moore* for the proposition that an act interfering with the "constitutionally mandated process of enacting law" imposes upon legislators an injury cognizable under Article III. *Byrd v. Raines*, 956 F.Supp. 25, 31 (D.D.C.1997).

On direct appeal, the Supreme Court reversed. The Court characterized the plaintiffs' injury as "wholly abstract and widely dispersed" and hence insufficient to warrant judicial remediation. 521 U.S. at 829, 117 S.Ct. 2312. The Court was apparently unmoved by the concern we expressed in *Moore* that the consideration of separation of powers issues would "distort[ ]" our standing analysis, 733 F.2d at 954; to the contrary, it emphasized that standing requirements are "especially rigorous" when reaching the merits of a case would raise questions about the proper scope of judicial authority. 521 U.S. at 819–20, 117 S.Ct. 2312. Having found that the plaintiffs lacked standing to sue, the Court did not find it necessary to consider the applicability (or the validity) of the doctrine of equitable discretion.

Against the backdrop of *Raines* and our own decisions after *Goldwater*, the futility of the present Representatives' claim is apparent. As the plaintiffs point out, the injury they allegedly suffered when the President issued Executive Order 13,061— a dilution of their authority as legislators—is precisely the harm we held in *Moore* and *Kennedy* to be cognizable under Article III. It is also, however, identical to the injury the Court in *Raines* deprecated as "widely dispersed" and "abstract." If, as the Court held in *Raines*, a statute that allegedly "divests [congressmen] of their constitutional role" in the legislative process does not give them standing to sue, 521 U.S. at 816, 117 S.Ct. 2312, then neither does an Executive Order that allegedly deprives congressmen of their "right[ ] to participate and vote on legislation in a manner defined by the Constitution." 733 F.2d at 951. Consequently, the portions of our legislative standing cases upon which the current plaintiffs rely are untenable in the light of *Raines*.

The Representatives protest that the injury alleged in *Raines* was less severe than that suffered by the plaintiffs in *Moore*. The votes of those Members of the Congress who opposed the Line Item Veto Act, they observe, were given full effect; they were simply too few to carry the day. The plaintiffs in *Moore*, on the other hand, claimed to have been entirely deprived of their constitutional right to originate a bill intended to raise revenue. Here, similarly (per the plaintiffs), the President denied Members of the Congress any opportunity to vote for or against the AHRI. Not only does *Moore* therefore survive *Raines*, urge the Representatives, but the present case more closely resembles the former than the latter.

This reasoning misperceives the theory of standing at issue in *Raines*. The plaintiffs in that case did not contend, as the Representatives imply, that their injury was the result of a procedural defect in the passage of the Line Item Veto Act. Rather, their view was that once the Act became law, it "alter[ed] the constitutional balance of powers between the Legislative and Executive Branches," to their detriment. 521 U.S. at 816, 117 S.Ct. 2312. This is only a minor variation on the injury asserted in *Moore*, where the beneficiary of the alleged change in the constitutional order was the Senate rather than the President. More to the point, it is exactly the position taken by the Representatives here: Their injury, they say, is the result of the President's successful effort "to usurp Congressional authority by implementing a program, for which [he] has no constitutional authority, in a manner contrary to the Constitution." Applying *Moore*, this court presumably would have found that injury sufficient to satisfy the standing requirement; after *Raines*, however, we cannot.

*Raines* notwithstanding, *Moore* and *Kennedy* may remain good law, in part, but not in any way that is helpful to the plaintiff Representatives. Whatever *Moore* gives the Representatives under the rubric of standing, it takes away as a matter of equitable discretion. It is uncontested that the Congress could terminate the AHRI were a sufficient number in each House so inclined. Because the parties' dispute is therefore fully susceptible to political resolution, we would, applying *Moore*, dismiss the complaint to avoid "meddl[ing] in the internal affairs of the legislative branch." 733 F.2d at 956. Applying *Raines*, we would reach the same conclusion. *Raines*, therefore, may not overrule *Moore* so much as require us to merge our separation of powers and standing analyses. In citing *Moore*, of course, the Representatives are not asking us to do that; instead, they would have us simply ignore half of that opinion.

As for *Kennedy*, it may survive as a peculiar application of the narrow rule announced in *Coleman v. Miller*, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939). The plaintiffs in *Coleman* were certain Kansas legislators who alleged that the Lieutenant Governor of Kansas had acted unlawfully by casting the tie-breaking vote in the state senate in favor of a constitutional amendment. According to the Court, the 20 legislators who had voted against the amendment had standing to sue because the Lieutenant Governor's act deprived them of their "plain, direct and adequate interest in maintaining the effectiveness of their votes." *Id.* at 438, 59 S.Ct. 972.

Although *Coleman* could be interpreted more broadly, the *Raines* Court read the case to stand only for the proposition that "legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect) on the ground that their votes have been completely nullified." 521 U.S. at 823, 117 S.Ct. 2312. Even under this narrow interpretation, one could argue that the plaintiff in *Kennedy* had standing. The pocket veto challenged in that case had made ineffective a bill that both hous-

es of the Congress had approved. Because it was the President's veto—not a lack of legislative support—that prevented the bill from becoming law (either directly or by the Congress voting to override the President's veto), those in the majority could plausibly describe the President's action as a complete nullification of their votes.

In this case, however, the Representatives do not allege that the necessary majorities in the Congress voted to block the AHRI. Unlike the plaintiffs in *Kennedy* and *Coleman*, therefore, they cannot claim their votes were effectively nullified by the machinations of the Executive. Consequently, even if *Kennedy* is still viable after *Raines*, it cannot bear the weight the Representatives would place upon it.*

### III. Conclusion

The district court correctly held the plaintiff Representatives lack standing to pursue this lawsuit. Their claim to standing on the ground that the President's implementation of the AHRI without congressional consent injured them by diluting their authority as Members of the Congress is indistinguishable from the claim to standing the Supreme Court rejected in *Raines*. Nor can the Representatives claim that their vote was nullified by the President's action. The decision of the district court is therefore

*Affirmed.*

---

* For two reasons our concurring colleague would have us decide this case as though the Supreme Court had never decided *Raines*. First he says the effect of *Raines* upon our prior decisions was not briefed by the parties. However, the parties plainly joined the issue whether *Raines* overrules our cases on the subject of legislative standing. *See* Appellees' Br. at 16 ("After the Supreme Court's decision in *Raines* ... it is questionable whether a member of Congress alleging an institutional injury can ever have Article III standing"); Appellant's Rep. Br. at 7 (asserting "[t]here is absolutely no authority" supporting the President's assertion "that *Raines* overturned *Moore*").

TATEL, Circuit Judge, concurring in the judgment:

I agree that appellants lack standing. I think the court should have reached that result, however, without exploring the extent to which *Raines v. Byrd,* 521 U.S. 811, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997), limits our decisions in *Kennedy v. Sampson,* 511 F.2d 430 (D.C.Cir.1974), and *Moore v. United States House of Representatives,* 733 F.2d 946 (D.C.Cir.1984). *See* Maj. Op. at 115–17.

In the course of deciding that *Raines* essentially overrules the theory of legislative standing recognized in *Kennedy* and *Moore*, my colleagues read those decisions too broadly, stating that the legislator injury we found cognizable in those cases "is precisely the harm" that appellants allege here. Maj. Op. at 116. But unlike appellants, the legislators in *Kennedy* and *Moore* challenged alleged constitutional defects in the way specific pieces of legislation were passed or defeated. *See Moore,* 733 F.2d at 951–53 (revenue-raising bill allegedly originated in the Senate, not the House); *Kennedy,* 511 F.2d at 434–36 (allegedly unconstitutional presidential pocket veto of legislation passed by Congress). Contrary to appellants' claim that they have been "denied the 'right[ ] to participate and vote on legislation in a manner defined by the Constitution,'" Appellant's Br. at 16 (quoting *Moore,* 733 F.2d at 951), they can point to no defect in any "discrete aspect of the process by which a bill becomes law (the actual vote on the legisla-

Second, he says the Representatives would lack standing even under the pre-*Raines* law of this circuit. This point rests upon the implicit premise that the standing analysis in *Moore* and *Kennedy* might have force after *Raines*, albeit (as he acknowledges) in circumstances not presented here. We think it clear, however, that our analysis in this case must account for the impact of *Raines* on the prior precedent of this circuit, and further, that *Raines* leaves no room for the broad theory of legislative standing that we adopted in *Moore* and *Kennedy*.

tion) [or] those post-enactment events denying the bill's status as law," *Harrington v. Bush,* 553 F.2d 190, 211 (D.C.Cir.1977). This case is therefore indistinguishable from and controlled by *United Presbyterian Church in the U.S.A. v. Reagan,* 738 F.2d 1375 (D.C.Cir.1984). There, as here, a Member of Congress challenged the legality of an executive order, claiming that it was promulgated without congressional or constitutional authorization. *See id.* at 1381–82. We held that the Member lacked standing because he raised only " 'a generalized grievance about the conduct of government, not a claim founded on injury to the legislator by distortion of the process by which a bill becomes law.' " *Id.* at 1382 (quoting *Moore,* 733 F.2d at 952); *see also Daughtrey v. Carter,* 584 F.2d 1050, 1057 (D.C.Cir.1978) (rejecting the argument that legislators have standing to challenge executive nonenforcement of an act as a usurpation of the legislative right to enact repealing legislation); *Harrington,* 553 F.2d at 211 (rejecting the argument that a legislator has standing to challenge allegedly illegal CIA activities as an impairment of his prospective votes on related legislation). For precisely the same reason, appellants lack standing to challenge the American Heritage Rivers Initiative.

Although *Raines* limits *Kennedy* and *Moore* to some extent, it changes nothing in *United Presbyterian* or the other cases where we have rejected legislator standing to raise similar "generalized grievances." Because *United Presbyterian* still squarely controls, it is unnecessary to reach the difficult issue of the precise extent to which *Raines* limits *Kennedy* and *Moore,* an issue not briefed in this case beyond the conclusory assertions cited by the court. *See Texas Rural Legal Aid, Inc. v. Legal Servs. Corp.,* 940 F.2d 685, 697–98 (D.C.Cir.1991) (in the "absence of any substantive briefing on the issue," where the parties "content [themselves] with conclusory assertions," this court normally will not address the argument). I think the court should have deferred addressing the implications of *Raines* until presented with

a case in which legislators assert injury involving a discrete aspect of the process by which a specific bill has become (or failed to become) law.