[711 NYS2d 402]

Sheldon Silver, as Member and Speaker of the New York State Assembly, Respondent, v George E. Pataki, as Governor of the State of New York, Appellant.

First Department, July 20, 2000

APPEARANCES OF COUNSEL

*Steven Alan Reiss* of counsel (*Eric Ordway, Ronald R. Rossi* and *Kerry C. Foley* on the brief; *Weil, Gotshal & Manges, L. L. P.,* attorneys), for respondent.

*Max R. Shulman* of counsel (*Cravath, Swaine & Moore,* attorneys), for appellant.

## OPINION OF THE COURT

BUCKLEY, J.

This case marks the first time that the principal officer of one of two chambers of the New York State Legislature has sought to involve the judiciary in one of the perennial budgetary struggles between the Legislature and the Governor. Despite no showing of authority for the institution of this litigation, the Assembly's Speaker has been found by Supreme Court to have the inherent capacity as a legislator to obtain judicial review of his challenge to the Governor's exercise of veto power. Because recognition of such inherent capacity would confer an authority to sue contrary to the letter and spirit of constitutionally distributed powers, and because the creation of this legislator's cause of action will needlessly propel the judiciary into future political conflicts, we reverse.

This case involves a confrontation between the Governor and one of the several leaders in the Legislature with respect to the propriety of line-item vetoes. The Governor appeals from Supreme Court's order, which found the Speaker of the Assembly to have capacity and standing to litigate the legality of the Governor's exercise of 55 line-item vetoes during the enactment of the 1998-1999 State budget. In this case of first impression, the Speaker of the Assembly seeks to litigate, only in his official capacities as Speaker and Member of the Assembly, the substantive issue of whether those budget bill vetoes were legal, i.e., whether each was a line-item veto authorized by article IV (§ 7) of the New York Constitution. The Speaker claims that the Governor had no constitutional power to use his line-item veto, while the Governor asserts that he was not constrained to reject the entire bill but could excise certain "items" since the bill was part of the budget process and contained "several items of appropriation of money."

The constitutional dimensions of New York's unique budget process have been the frequent subject of judicial interpretation during the last 70 years (*see, e.g., People v Tremaine,* 252 NY 27 [legislators improperly appointed to administer ap-

propriated funds]; *People v Tremaine*, 281 NY 1 [Governor's itemized budget cannot be replaced by Legislature's lump-sum budget]; *Matter of Posner v Rockefeller*, 26 NY2d 970 [members of Legislature have no standing to challenge validity of budget bill submitted by Governor]; *New York State Bankers Assn. v Wetzler*, 81 NY2d 98 [Legislature's addition of revenue provision in budget bill unconstitutional]). On the one occasion when our Court of Appeals specifically considered legislator lawsuits regarding the budget, it broadly declined to recognize such causes of action (*Matter of Posner v Rockefeller, supra*, at 971-972). To reach the result it proposes today, the dissent must ignore the history of our Constitutions and repudiate sound precedent which keeps the judiciary out of political disputes. Logic and common sense counsel judicial abstinence, or at least restraint, when a political dispute beckons, as this does.

According to the Speaker, the present dispute arises from the Legislature's response to *New York State Bankers Assn. v Wetzler* (*supra*), whereby, to preserve the legislators' desire to enact amendments to the Governor's budget bill, an "appropriations" budget bill and a complementary "programmatic" budget bill have been enacted in recent years as part of the annual budget process. Although there is no apparent legal warrant for such budget bifurcation, the Speaker asserts that the Governor can only veto the entire "programmatic" budget bill and, thus, has no line-item veto power with respect to that bill.

It is undisputed that budget litigation may present questions which are "justiciable" (*People v Tremaine, supra*, 252 NY, at 47) since courts are " 'always * * * available to resolve disputes concerning the scope of that authority which is granted by the Constitution to the other two branches of the government' " (*Matter of King v Cuomo*, 81 NY2d 247, 251, quoting *Saxton v Carey*, 44 NY2d 545, 551). This is not a case implicating either the immunity of a coordinate branch of government (*Matter of Straniere v Silver*, 218 AD2d 80, *affd* 89 NY2d 825) or a grievance more appropriately raised in a representative branch of government (*Society of Plastics Indus. v County of Suffolk*, 77 NY2d 761, 769). The present dispute involves the nature and scope of the delegated authority shared by the Executive and the Legislature in the enactment of the annual budget and is clearly justiciable when raised by an appropriate litigant. It is also clear that a legislator's lawsuit is not the only way to secure judicial review of the challenged practice since the would-be beneficiaries of the budget items vetoed by the Governor have causes of action identical to that sought to be

litigated by the Speaker. Not one of those presumed beneficiaries has challenged the line-item vetoes. While not discussed by the dissent, this is not a case where the Legislature has authorized litigation to vindicate its legislative prerogatives. That a dispute may become justiciable does not mean that it has become so. A justiciable controversy can only be presented by a party with the capacity and standing to litigate.

As framed by the Governor's pre-answer motion to dismiss, the threshold questions raised by this litigation are whether the party seeking judicial intervention has capacity and, if so, whether such party has standing (*Matter of Pooler v Public Serv. Commn.*, 58 AD2d 940, *affd* 43 NY2d 750; *Matter of Dairylea Coop. v Walkley*, 38 NY2d 6, 9).

Having taken the latter question first, the IAS Court correctly formulated the standing test as an evolutionary product of the past several decades, marked by a significant expansion of the types of plaintiffs who can seek judicial relief (*compare, Rudder v Pataki*, 93 NY2d 273, 278-281 [no organizational, citizen-taxpayer or voter standing] *with Saxton v Carey*, 61 AD2d 645, 647-648, *affd* 44 NY2d 545, *supra* [citizen-taxpayer standing based on statute]). This judicial recognition of new plaintiffs has, however, not eliminated basic conditions which must be satisfied by one who would seek judicial review of the acts of coordinate branches of government. This expansion of justiciable controversies has not become a lever by which political issues may be removed to a courtroom. Moreover, a logical precondition to standing remains the legal capacity of a litigant, here the Speaker, to seek a judicial remedy.

Standing does not create a juridical entity which has the ability to assert legal rights. A putative litigant must first have the capacity to be a party. The Speaker's capacity cannot be based upon his citizenship or his paying of taxes as he has elected to proceed, despite the invitation of the IAS Court, in his capacity as Speaker and Member of the Assembly.

Without the capacity to sue, a party may have standing but nonetheless remain unable to obtain judicial review (*Matter of Pooler v Public Serv. Commn., supra; Matter of Queens Hosp. Ctr. Community Advisory Bd. v New York City Health & Hosps. Corp.*, 227 AD2d 147, *lv denied* 88 NY2d 814). Capacity focuses on the legal ability of this individual or entity to seek judicial relief and not on the cause of action which may nonetheless belong to the individual or entity (*Walter v Walter*, 170 App Div 870, *affd* 217 NY 439). The capacity question asks whether this party has the status to litigate the issues presented in the

case. Capacity is an issue when, for example, an agent claims to act on behalf of a corporate entity or in furtherance of the corporate entity's interests.

In this case, the IAS Court held that the Governor's objection to the Speaker's capacity totally lacked merit since no court had found a lack of capacity in a legislator litigant. However, capacity must be found based on an express legal grant of capacity or on a necessary implication from a grant of other legal powers (*Tinterorias Ibericas De Peleteria v Gafco, Inc.*, 114 AD2d 329; *Regan v Cuomo*, 182 AD2d 1060, 1061). The mere absence of decisional law regarding legislator capacity is not the firm foundation upon which constitutional litigation should proceed. That the courts of this State have not had occasion to elaborate a complete jurisprudence of legislator capacity does not mean that capacity can be assumed and it does not mean that the Speaker should be presumed to have capacity based on standing arguments. The judiciary has wisely used various rules of "self-restraint" to limit the types of disputes adjudicated on constitutional grounds or the necessity of basing a decision upon a provision of the Constitution (*Society of Plastics Indus. v County of Suffolk, supra*, at 773). The requirement that a party have capacity to sue, while infrequently at issue, ensures that judicial relief is available to an individual or entity legally competent to litigate the cause of action. While standing guarantees that the litigation will be adversarial and resolve disputed rights between actual parties, capacity bears upon the requirement that rights be vindicated by a party to whom they belong. While the capacity of individuals is often self-evident, the capacity of corporate entities and their agents is not so straightforward. Where, as here, judicial relief is sought in an alleged constitutional dispute between coordinate branches of government, it is particularly apt to ascertain the legal capacity of the litigant attempting to vindicate the generalized institutional interest of a legislative body.

The Speaker has provided no evidence of that capacity. The dissent identifies no express power(s) from which capacity can be necessarily implied. This is not surprising. A review of the powers of the Speaker reveals that his authority regarding legislative matters is far from plenary. Indeed, the Speaker and a Member of the Assembly exercise legislative powers which are limited in many ways and, in budgetary matters, shared with the Governor.

An examination of the distribution of powers in the New York Constitution reveals that this capacity issue demands

closer scrutiny and an approach markedly different from that found in the dissent. While the dissent relies upon Federal and New York cases, the starting point must be the text of this State's fundamental law. "The plain language of the Constitution provides the framework for our analysis" (*Blue Cross & Blue Shield v McCall*, 89 NY2d 160, 168).

Executive power is vested in the Governor (NY Const, art IV, § 1). Legislative power is vested in the Senate and Assembly (NY Const, art III, § 1). The Governor's powers are personal; that delegation is in stark contrast to the institutional delegation of power made to the Senate and Assembly. The Speaker is a leader of one of two legislative chambers and only exercises such delegated powers as are attendant thereto, granted on the sufferance of the Assembly. While the Speaker is nominally a constitutional officer, he exercises no express constitutional authority resulting from his inclusion in that document (NY Const, art III, § 9 ["and the assembly shall choose a speaker"]; *see*, Temp Commn on Rev and Simplification of Constitution, 1961 NY Legis Doc No. 14, at 43). Indeed, the express powers of the Speaker are statutory and circumscribed in fine detail (1994 Opns Atty Gen 1 [No. 94-F1]; *see, e.g.*, Legislative Law §§ 7 [may only appoint employees or authorize expenditures on certain conditions], 12 [must submit expenditure authorization with Temporary President of Senate]). There is no broad grant of authority to the Speaker in the Constitution or statutes.

While the Constitution provides that the legislative power is vested in the Senate and Assembly and that each house selects its own officers and determines its own rules, the legislative power to financially obligate the State is limited to those "claims * * * audited and allowed according to law" (NY Const, art III, § 19). In furtherance of this clearly defined grant of legislative fiscal authority, Legislative Law § 21 commands that "[n]either house shall, without the consent of the other * * * incur any expense whatever except as provided by this chapter." There is no authorization contained in the Constitution or the Legislative Law for a legislator, even one of the chosen leaders of either house, to unilaterally initiate and conduct litigation or even authorize a debt for attorneys' fees when backed by a resolution of one house (*Carr v State of New York*, 231 NY 164).

If a legislator incurs an expense as part of "official duties," the law requires reimbursement of such actual expense (Public Officers Law § 64). Since money can only be paid pursuant to an express authorization (NY Const, art VII, § 7; State Finance

Law § 4), if a legislator's official duties actually encompassed litigation, one would expect to find constitutional or statutory authorization for such activity. There is none.

Nor is this view of authorized legislative power unduly narrow or crimped. Evaluation of a claim of legislative authority in this State must be grounded upon the text of our Constitution (*Matter of Sherrill v O'Brien*, 188 NY 185, 199). Analysis of State Constitutions starts from a premise different from that underlying analysis of the Federal Constitution, namely, that delegated powers are not inherently or necessarily limited. Any particular exercise of a legislative power is generally to be presumed valid under a State Constitution; there is, typically, a burden of proof to demonstrate that the exercise of a power is illegitimate (*see generally*, Tarr, Understanding State Constitutions, at 7-8, 16, 22). To ascertain the warrant for legislative power in New York, however, we must descend from facile constitutional generalities to the specific language and purposes of our own Constitution as it evolved over the last two centuries.

The original delegation of legislative power, while plenary in scope, was clearly intended to be exercised by the corporate body and not by an individual: "the supreme legislative power within this state shall be vested in two separate and distinct bodies of men * * * who together shall form the legislature" (NY Const of 1777 art II). The original delegation of plenary legislative power was soon thereafter followed by repeated amendments of our Constitution to restrain, impair or balance the use of the legislative power (*see generally*, Galie, Ordered Liberty, at 83-84, 103-105, 121-122, 166-170). Even the Governor, normally functioning as an executive, has an affirmative legislative role; the essential nature of the relationship between the Legislature and the Governor in the budget process can only be described as political (NY Const, art VII, §§ 1-7; *Matter of Posner v Rockefeller, supra,* at 971-972). The Legislature acts through passage of law (*Matter of Koenig v Flynn*, 258 NY 292, 300-301, *affd* 285 US 375) or by concurrent resolution (*People ex rel. Hastings v Hofstadter*, 258 NY 425, 432). Based upon the express delegation of legislative power to a bicameral entity, one would naturally expect legislative authorization as a predicate for a suit to vindicate the "will" of the Legislature. The Speaker here, however, stands alone—one Member of a 150-person Assembly (State Law § 120), one legislator of a 211-person Legislature (State Law §§ 120, 123)— without any request by the Assembly or by the Legislature for

such challenge or without even authorization for any expenses incident to this litigation. We are, nonetheless, asked to assume his authority and capacity; to do so, we must ignore or disavow settled precedent.

The Speaker has no express delegation of power to obtain judicial review against the Governor. There is no express legal authorization enabling the Speaker to sue nor has the Legislature conferred capacity on the Speaker. While capacity to sue may be implied as a matter of law from other powers (*Regan v Cuomo*, 182 AD2d 1060, 1061), there is simply no express power upon which capacity can be implied. The Rules of the Assembly clearly set forth the duties and powers of the Speaker, none of which includes litigation (*see*, Rules of the Assembly, rule I, § 1 [a]-[c]). The Speaker is a legislative officer who appoints committee chairs, allocates staff, expedites or impedes action on bills, and administers the rules internal to the Assembly (Zimmerman, Government and Politics of New York State, at 129-130). While it is the work of legislators to legislate, the Speaker presides.

This case cannot involve a constitutional confrontation between the Legislature and the Executive since the Speaker has not been authorized by the Legislature to commence this action. While the IAS Court summarily dismissed the capacity objection as being meritless, the dissent would base affirmance on an inherent capacity which is supposed to result from the Speaker's status. This is done by reliance upon inapposite Federal cases which arose under a very different Constitution and citation to New York decisions which did not involve the level of government, parties or issues litigated here. The Federal Constitution has not been repeatedly amended to confine, restrict and balance the legislative power originally delegated to the Legislature (*compare*, US Const, art I, §§ 1, 8, *with* NY Const, art III, §§ 1, 12-23; art VII, §§ 8-19). The Federal Constitution does not allocate legislative duties with respect to annual budget lawmaking between the Legislature and the Governor (*compare*, US Const, art I, § 7, *with* NY Const, art VII, §§ 2-7; art IV, § 7). Finally, the dissent fails to consider the limited duties and powers of the Speaker, as well as the expense-reimbursement provisions of State law.

Were, as the dissent would have it, legislators judicially empowered to litigate whenever they perceived an "encroachment" by the Governor on their legislative functions, the judiciary would be inextricably enmeshed in a never-ending series of challenges to executive action and inaction. Were the Judi-

ciary to accept this open-ended and extraconstitutional invitation to adjudicate disputes between individual legislators and the Governor involving enactment of legislation, there would be no evident barrier to lawsuits amongst legislators. After all, in budget legislation the Assembly, Senate and Governor share legislative duties which are in their essence political. If a legislator can sue the Governor, there is no principled reason to decline to adjudicate disputes between legislators of the same house and between legislators of each house. Lawmaking would then proceed, in fits and starts, with the aid of declaratory judgments and injunctions and at the pace dictated by litigation. Nor would judicial management of lawmaking be restricted to enactment issues. Legislative will can be frustrated, no doubt, in countless postenactment ways. On the simple rationale provided by the dissent, the judiciary would always be available to provide a remedy for any wrong sustained by a legislator, any encroachment arguably threatened upon the legislative will. Very quickly, political struggles would be routinely displaced by litigation.

The particular plaintiff in this action places himself on a different plane than that occupied by an individual legislator. The Speaker himself identifies his litigation posture as one vindicating the legal authority of the Legislature. The Speaker has not been prevented from discharging his legal duties as either Speaker or as Member by any action of the Governor. The Speaker is not a party based upon any purported legal injury personal to him. It is, we are told, the will of the Legislature which has been "frustrated" by the challenged vetoes.

The Legislature could have authorized the present litigation, but the Legislature did not. Nor did the Speaker seek authority from the Legislature for this litigation. There is simply no historical or jurisprudential precedent for this lawsuit. The Court of Appeals has recognized various types of capacity problems raised by a litigant's status or corporate nature (*Community Bd. 7 v Schaffer*, 84 NY2d 148, 155). Often, however, a litigant's capacity has been confused with standing, turning the inquiry into whether or not the litigant has suffered injury (*Winner v Cuomo*, 176 AD2d 60, 63; *Matter of Sullivan v Siebert*, 70 AD2d 975). For the purpose of analyzing capacity, we must ask whether this litigant is able or has been enabled to vindicate the rights which he asserts. To the extent those rights are not personal but are institutional, a capacity problem is presented. None of the courts which have considered legislator capacity have been faced with the constitutional distribu-

tion of power underlying the present dispute, with a challenge over the exercise of a constitutional power and with a litigant seeking to assert the corporate legal rights of a coordinate branch of government.

Indeed, New York precedent forecloses this litigation. The *Posner* Court (*supra*) squarely held 30 years ago that individual legislators, as legislators, are unable to bring disputes regarding budgetary differences with the Governor into a court. The *Posner* Court was very clear that the New York bar to legislator causes of action is very broad (*Matter of Posner v Rockefeller, supra*, at 971-972).

The only evidence provided to the IAS Court consisted of the Speaker's affidavit in which he argued that he had sustained injury in fact and that his interests were within a legally protected zone rendering him a litigant with standing. The capacity of the Speaker to sue is not created by the Constitution, is not necessarily implied from the powers conferred on the Speaker, is not a byproduct of standing, and has not previously been claimed nor recognized. There is nothing in the duties or powers of the Speaker of the Assembly, explicitly granted and detailed by statute and legislative rules, which requires or suggests that his responsibilities include seeking judicial review of gubernatorial actions. The Speaker simply has no authority to represent the corporate interests of the Legislature—he has no capacity to litigate this action.

Even were the capacity issue deemed resolved on the basis of the Speaker's inherent authority, standing cannot be found for this legislator lawsuit. The Speaker has made no allegation of any personal harm nor any remediable interference with the performance of his duties. An institutional injury of this sort does not constitute sufficient injury to confer standing (*Raines v Byrd*, 521 US 811, 821-828; *Matter of Posner v Rockefeller*, 26 NY2d 970, *supra*). For the foregoing reasons, we reverse, grant the motion and dismiss this action.

Accordingly, the order of the Supreme Court, New York County (Edward Lehner, J.), entered January 7, 1999, which, insofar as appealed from, denied defendant's motion to dismiss on the ground that plaintiff lacks standing and legal capacity, should be reversed, on the law, without costs, the motion granted and the action dismissed. The Clerk is directed to enter judgment in favor of defendant dismissing the complaint.

WILLIAMS, J. (dissenting). I would affirm the motion court's order since there is ample authority to support the proposition

that the Speaker of the Assembly has legal capacity and standing in this instance to challenge the Governor's 55 line-item vetoes of particular provisions of bills passed by the Legislature. Contrary to the majority's view, the Speaker has both the power to appear and bring his grievance before the court and "a sufficiently cognizable stake in the outcome so as to 'cast[ ] the dispute "in a form traditionally capable of judicial resolution" ' " (*Community Bd. 7 v Schaffer*, 84 NY2d 148, 155, quoting *Society of Plastics Indus. v County of Suffolk*, 77 NY2d 761, 772-773, quoting *Schlesinger v Reservists Comm. to Stop War*, 418 US 208, 220-221).

Although the majority admits, as it must, that legal capacity to sue need not be expressly granted and that it may be implied as a matter of law (*see, Matter of City of New York v City Civ. Serv. Commn.*, 60 NY2d 436, 443-445), it nevertheless belabors the point that there is an absence of express legislative authorization for this lawsuit. However, this case presents a classic example of capacity arising by "necessary implication from [the plaintiff's] power and responsibility" (*supra,* at 444). Plaintiff is both a Member of the New York State Assembly and its presiding officer, with the constitutional power and responsibility to consider and vote on legislation. This necessarily implies that he has the power to bring a grievance in court to vindicate the effectiveness of his vote where he is alleging that the Governor has acted improperly so as to usurp or nullify that vote (*see, Coleman v Miller*, 307 US 433 [20 Kansas State senators who voted against a Federal constitutional amendment were permitted to bring an action alleging that their votes were effectively nullified by the Lieutenant Governor's tie-breaking vote in favor of amendment]). Moreover, there is New York authority supporting the proposition that an individual legislator has the legal capacity to bring an action to protect the rights of the Assembly (*Matter of Sullivan v Siebert*, 70 AD2d 975 [individual Assembly Member had legal capacity and standing to compel heads of executive departments to make their respective, statutorily required annual reports to the Legislature]; *Winner v Cuomo*, 176 AD2d 60 [three Assembly Members allowed to seek declaratory relief against the Governor for failure to meet constitutional and statutory deadline for submitting budget bills to Legislature]). The majority fails to cite any New York authority holding that a legislator lacks capacity to sue to protect the legislative function from alleged encroachment by the Executive Branch.

As for standing, the majority would have us find that *Matter of Posner v Rockefeller* (26 NY2d 970) and *Raines v Byrd* (521

US 811) are controlling here, and that the Speaker does not have a sufficient interest at stake to render this matter justiciable. This view ignores the trend of New York law since *Posner* and ignores the Supreme Court's express refusal in *Raines* to overrule *Coleman v Miller (supra)*, a case which is similar to the matter before us.

Since *Posner*, New York courts have taken a more liberal view toward standing beginning with *Boryszewski v Brydges* (37 NY2d 361), which recognized taxpayer standing to challenge legislative enactments on constitutional grounds, *Matter of Morgenthau v Cooke* (56 NY2d 24, 30), which found that petitioner New York County District Attorney had standing, in his official capacity, to challenge the manner of designating Justices to serve on New York County Supreme Court, and including *Matter of Sullivan v Siebert (supra)* and *Winner v Cuomo (supra)*.

The *Raines* Court declined to overrule *Coleman (supra)*, instead finding that it stands "for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified" (*Raines v Byrd, supra,* at 823). Here, the Speaker seeks to vindicate the Legislature's enactment of provisions alleged to have been nullified by the Governor's improper use of his line-item veto power.

The contention that *Coleman*, if applicable here, would require that all of the legislators who voted for the bills, not just the Speaker, be parties to this action is inconsistent with the *Sullivan* and *Winner* cases, and also with the view expressed in *Chenoweth v Clinton* (181 F3d 112, 116-117, *cert denied* 529 US 1012). The *Chenoweth* court notes in dictum that its pre-*Raines* decision in *Kennedy v Sampson* (511 F2d 430) is supported by the *Raines* Court's reading of *Coleman*. In *Kennedy*, the court permitted a single member of Congress to challenge the President's pocket veto of legislation approved by both houses of Congress, since the veto could be viewed as a complete nullification of his vote (*Chenoweth v Clinton, supra,* at 116-117).

WALLACH and SAXE, JJ., concur with BUCKLEY, J.; ROSENBERGER, J. P., and WILLIAMS, J., dissent in a separate opinion by WILLIAMS, J.

Order, Supreme Court, New York County, entered January 7, 1999, reversed, on the law, without costs, the motion to dismiss the complaint granted and the action dismissed.