OPINION OF THE COURT
Per Curiam.
In January 1998, defendant Governor George E. Pataki submitted his Executive budget to the houses of the New York State Legislature, along with several budget bills. Some of the bills submitted appropriated monies while others detailed the utilization of appropriated funds or proposed changes in the operation of certain programs. After public hearings and internal negotiations between houses, the Legislature passed and transmitted to the Governor six appropriation bills and three “non-appropriation” bills,[1] which struck out or reduced certain appropriations proposed by the Governor, while adding new appropriations and directives. In addition to vetoing several provisions in the appropriation bills, the Governor exercised his line-item veto power 55 times to remove provisions from the “non-appropriation” bills.
Plaintiff — as “Member and Speaker, New York State Assembly”[2] — commenced this action, asserting that while the Governor has the constitutional right to veto line items in an appropriation bill, he has no similar right to veto items in “non-appropriation” bills, which must be approved or rejected in their entirety. The Speaker seeks a declaration that the 55 vetoes violated article IV, § 7 of the New York Constitution, and that legislation relating to the budget that does not appropriate money is not subject to the line-item veto power. The Governor contends that the bills in question were part of the budget process and contained items of appropriation subject to his line-item veto.
Supreme Court denied the Governor’s motion to dismiss, rejecting his claim that plaintiff lacks standing and legal capacity to bring the action. A majority at the Appellate Division re *536 versed, concluding that plaintiff lacks capacity to sue because he has no express or inherent authority to bring the action and that he has no standing because he failed to allege personal harm beyond mere institutional injury.[3] The dissenting Justices’ contrary view focused on the necessary implication that a legislator — who has the power and responsibility to consider and vote on legislation — has the capacity to bring an action to vindicate the effectiveness of his or her vote. Under the circumstances presented here, we agree, in part, with the dissenters: plaintiff — as a Member of the Assembly — can maintain an action “to vindicate the effectiveness of his vote where he is alleging that the Governor has acted improperly so as to usurp or nullify that vote” (274 AD2d 57, 67).
Our current Executive budget system is embodied in article VII of the New York Constitution. Each Executive department must initially furnish the Governor with financial estimates, that are also supplied to relevant legislative committees, and upon which budget hearings are then held (see, NY Const, art VII, § 1). Itemized estimates of the financial needs of the Legislature and Judiciary are also transmitted to the Governor. Thereafter, the Governor must submit, along with the budget, a bill or bills containing all of the proposed appropriations and related legislation (see, id,., §§ 2, 3). The action that the Legislature can take on the Governor’s budget bills is limited to striking out or reducing “items therein, but it may add thereto items of appropriation provided that such additions are stated separately and distinctly from the original items of the bill and refer each to a single object or purpose” (id., §4). However, any separate items of appropriation added to the Governor’s bills by the Legislature are subject to the line-item veto power of article IV, § 7 (see, id.).
The budget process has been the subject of prior legal skirmishes between the Governor and the Legislature (see, e.g., New York State Bankers Assn. v Wetzler, 81 NY2d 98; People v Tremaine, 281 NY 1 [Tremaine II]; People v Tremaine, 252 NY 27 [Tremaine I]). The present appeal calls upon us to determine only a limited threshold issue: does Mr. Silver, as a Member or Speaker of the Assembly, have capacity and standing to bring this action?
*537 Capacity to sue is a threshold matter allied with, but conceptually distinct from, the question of standing. As a general matter, capacity “concerns a litigant’s power to appear and bring its grievance before the court” (Community Bd. 7 v Schaffer, 84 NY2d 148, 155). Capacity may depend on a litigant’s status or, as here, on authority to sue or be sued. In Community Bd. 7, we noted that capacity may be expressly conferred or “inferred as a ‘necessary implication from [the agency’s] power[s] and responsibilities],’ provided, of course, that ‘there is no clear legislative intent negating review’ ” (id. at 156 [quoting Matter of City of New York v City Civ. Serv. Commn., 60 NY2d 436, 443-444, rearg denied 61 NY2d 759]). The “power to bring a particular claim may be inferred when the agency in question has ‘functional responsibility within the zone of interest to be protected’ ” (id. [quoting Matter of City of New York, supra, at 445]). This test is related, but not identical to, the traditional “zone of interest” analysis employed in determining standing.
As a Member of the Assembly, plaintiff is entrusted by the Constitution to exercise legislative power (see, NY Const, art III, §§ 1, 2). “[Ejxcept as restrained by the constitution, the legislative power is untrammeled and supreme * * *. Nothing is subtracted from the sum of legislative power, except that which is expressly or by necessary implication withdrawn” (Matter of Thirty-Fourth St. Ry. Co., 102 NY 343, 350-351). Plaintiff has the broad power and functional responsibility to consider and vote on legislation. That responsibility necessarily includes continuing concern for protecting the integrity of one’s votes and implies the power to challenge in court the effectiveness of a vote that has allegedly been unconstitutionally nullified.
Individual legislators have several times in the past challenged the frustration of their authority (see, e.g., Anderson v Regan, 53 NY2d 356 [two Senators brought action against State Comptroller over dispute whether Federal funds must be appropriated by the Legislature prior to disbursement by the Executive department]; Winner v Cuomo, 176 AD2d 60 [three Assembly Members challenged Governor’s untimely submission of budget bills to Legislature]; Matter of Sullivan v Seibert, 70 AD2d 975 [Assembly Member commenced action to compel heads of Executive departments to make timely annual reports to the Legislature as required by statute]). Indeed, legislators and the districts they represent could be disenfranchised from the constitutionally mandated budget process if *538 stripped of the capacity to sue when confronted with allegedly unlawful or unconstitutional conduct of others that directly affects their official responsibilities.[4]
We reject the notion that plaintiffs functional responsibilities as a legislator are at an end once a bill is voted upon and leaves the Assembly. Such a narrow view could render a1 legislator’s vote meaningless and unnecessarily dilute one’s legislative responsibilities. A legislator surely would have the capacity to sue if prevented from casting a meaningful vote on legislation at the outset (see, e.g., Winner v Cuomo, supra). We see no principled basis for distinguishing between a legislator’s pre-vote and post-vote interests in the validity and effectiveness of that vote. A procedure that nullifies a legislator’s vote is as harmful as one that precludes it. In each case, the legislator and the thousands of New Yorkers he or she represents are unlawfully precluded from participating in the governmental process. Thus, Mr. Silver does have capacity to sue as a Member of the Assembly.
The Speaker also asserts that as leader of the Assembly, he has the inherent capacity to sue on its behalf. The Constitution, however, does not give the Speaker representative authority for the body over which he presides. Nor has the Assembly passed a resolution expressing its will that the Speaker engage in this litigation.
The Assembly Speaker is nominally a constitutional officer (NY Const, art III, § 9), but his express statutory powers are circumscribed (see, e.g., Legislative Law §§ 7, 12 [appointment of employees and expenditure authorizations]). Other duties are merely administrative, and include preserving order and decorum, appointing committee members and chairpersons, allocating staff, administering internal rules, and promulgating a budget adoption schedule (see, Rules of Assembly of State of NY, 1997-1998, rule I). None of these specific responsibilities are broad enough to confer on the Speaker any special implied authority to seek judicial review on behalf of the interests of the Assembly in general. Accordingly, as Speaker, plaintiff has no special authority to maintain .this action.
Having concluded that plaintiff has capacity to bring this action as a Member of the Assembly, we next address the related question whether plaintiff has suffered an injury in fact sufficient to confer standing on him. We conclude that he has.
*539 The test for determining a litigant’s standing is well settled. A plaintiff has standing to maintain an action upon alleging an injury in fact that falls within his or her zone of interest. “The existence of an injury in fact — an actual legal stake in the matter being adjudicated — ensures that the party seeking review has some concrete interest in prosecuting the action which casts the dispute ‘in a form traditionally capable of judicial resolution’ ” (Society of Plastics Indus. v County of Suffolk, 77 NY2d 761, 772 [citation omitted]).
Cases considering legislator standing generally fall into one of three categories: lost political battles, nullification of votes and usurpation of power. Only circumstances presented by the latter two categories confer legislator standing (see, e.g., Coleman v Miller, 307 US 433 [vote nullification]; Dodak v State Admin. Bd., 441 Mich 547, 495 NW2d 539 [usurpation of power belonging to legislative body]; cf., Raines v Byrd, 521 US 811 [no standing to challenge lost vote]; Matter of Posner v Rockefeller, 26 NY2d 970 [same]).
Plaintiff identifies two types of injury — one suffered by the Legislature as a whole and the other involving the nullification of his vote.[5] As a Member of the Assembly who voted with the majority in favor of the budget legislation, plaintiff undoubtedly has suffered an injury in fact with respect to the alleged unconstitutional nullification of his vote sufficient to confer standing. The circumstances here are analogous to those present in Coleman v Miller (307 US 433, supra). In Coleman, the United States Supreme Court recognized the standing of 20 members of the Kansas State Senate challenging that body’s ratification of an amendment to the Federal Constitution when a 20-20 deadlock was broken by the vote of the State’s Lieutenant Governor. The Supreme Court determined that the Senators had “a plain, direct and adequate interest in maintaining the effectiveness of their votes” (id., at 438; see also, Kennedy v Sampson, 511 F2d 430, 436 [DC Cir] [no more essential interest could be asserted by a legislator than to vindicate the ef *540 fectiveness of his vote]).[6] The Court explained that the Senators’ votes had been held for naught because, if their allegations were correct, the amendment would not have been ratified. Thus, the legislators were sufficiently aggrieved — suffering an injury in fact — to allow them to maintain the action.
Here, plaintiff as a Member of the Assembly won the legislative battle and now seeks to uphold that legislative victory against a claimed unconstitutional use of the veto power nullifying his vote. If plaintiffs allegations are correct, and at this point in the litigation we must assume they are, the vetoed provisions were improperly invalidated and should be in effect. Such a direct and personal injury is clearly within a legislator’s zone of interest and unquestionably represents a “ ‘concrete and particularized’ ” harm (Raines, supra, 521 US, at 819 [citation omitted]; accord, Dennis v Luis, 741 F2d 628, 630-631 [3d Cir]; Fordice v Bryan, 651 So 2d 998, 1003 [Miss]; Hendrick v Walters, 865 P2d 1232, 1236-1238 [Okla]). As Supreme Court noted, plaintiff is not “seeking to obtain a result in a courtroom which he failed to gain in the halls of the Legislature” (179 Misc 2d 315, 322).
Matter of Posner v Rockefeller (26 NY2d 970, supra) and Raines v Byrd (521 US 811, supra) do not require a different result. In each case, the plaintiff-legislators lost their political battles when legislation was validly enacted over their opposition. No vote nullification was alleged; they suffered no direct, personal injury beyond an abstract institutional harm. Thus, each lacked standing to sue. Indeed, in Raines the United States Supreme Court recognized the continuing vitality of Coleman and acknowledged that the injury suffered by a legislator voting with the majority whose vote is nullified is cognizable by the courts, explaining that “legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified” (521 US, at 823).
Nor is a controlling bloc of legislators (a number sufficient to enact or defeat legislation) a prerequisite to plaintiff’s standing as a Member of the Assembly. The Coleman Court did not rely on the fact that all Senators casting votes against the amendment were plaintiffs in the action (see, Kennedy v Sampson, *541 supra, 511 F2d, at 435 [“In light of the purpose of the standing requirement * * * we think the better reasoned view * * * is that an individual legislator has standing to protect the effectiveness of his vote with or without the concurrence of other members of the majority”]). Moreover, plaintiffs injury in the nullification of his personal vote continues to exist whether or not other legislators who have suffered the same injury decide to join in the suit.[7]
The dissent contends that plaintiff did not establish vote nullification because he still had a remedy within the political process — seeking to override the vetoes by a two-thirds supermajority (see, dissenting opn, at 546; NY Const, art IV, § 7). The existence of other possible political remedies, however, does not negate the injury in fact (see, Campbell v Clinton, 52 F Supp 2d 34, 45 n 11 [“The mere availability of a legislative alternative is not sufficient to defeat standing; if it were, a legislator would never have standing since Congress always has the option of impeaching and removing the President” (emphasis in original)], affd 203 F3d 19, cert denied 531 US 815). The supermajority override is a political remedy for validly imposed vetoes. This case, contrary to the dissent’s view, is not about a general dispute over legislative authority or its limitations. It focuses on a discrete and defined event implicating a constitutional restriction on use of the line-item veto power. It does not call upon this Court to enter a political debate — it presents only a straightforward legal question.
Lastly, that other parties may also be aggrieved by some of the Governor’s contested vetoes does not diminish the direct injury suffered by plaintiff, as a Member of the Legislature (see, Clinton v City of New York, 524 US 417, 434 [it is “self-evident” that “more than one party may have standing to challenge a particular action or inaction”]). Indeed, a contrary conclusion could insulate unconstitutional conduct from judicial review.
*542 This Court has repeatedly emphasized that “the budgetary process is not always beyond the realm of judicial consideration and that the ‘courts will always be available to resolve disputes concerning the scope of that authority which is granted by the Constitution to the other two branches of the government’ ” (New York State Bankers Assn. v Wetzler, 81 NY2d 98, 102 [emphasis in original], supra [quoting Saxton v Carey, 44 NY2d 545, 551]; see also, Matter of King v Cuomo, 81 NY2d 247, 251). The capacity and standing of an individual legislator to seek judicial redress in these circumstances is essential to protect the separation of powers and rights of the Legislative branch.
Contrary to the Appellate Division majority view, our decision today will not open the possibility of countless legislator lawsuits that would impair the legislative process. That has not been the case — only a handful of legislator lawsuits have arisen in this State to date. We announce nothing new today. We only confirm what was assumed before: in limited circumstances, legislators do have capacity and standing to sue when conduct unlawfully interferes with or usurps their duties as legislators.
The parties’ remaining arguments are without merit.
Accordingly, the order of the Appellate Division should be modified, without costs, by denying defendant’s motion to dismiss the complaint insofar as it is brought by plaintiff as a Member of the New York State Assembly and, as so modified, affirmed.

. The term “non-appropriation” bill is not found in the Constitution. These bills contain programmatic provisions and commonly include sources, schedules and sub-allocations for funding provided by appropriation bills, along with provisions authorizing the disbursement of certain budgeted funds pursuant to subsequent legislative enactment.

. Plaintiff brought this action in his official capacities only, not as a taxpayer under article 7-A of the State Finance Law.

. Although the Appellate Division based part of its analysis on the absence of any express authorization for the reimbursement of legal fees incurred in such an action (274 AD2d 57, 62-63), the propriety of those expenditures is not before us.

. No other jurisdiction in the nation has held that an individual legislator lacks capacity to sue.

. We agree with our dissenting colleague that plaintiffs allegation of injury to the Assembly as a whole, characterized as interference with his ability “to negotiate the Assembly’s priorities and interests in the budget process” (dissenting opn, at 543), at best reflects a political dispute. This type of political harm is no more than an abstract institutional injury that fails to rise to the level of a cognizable injury in fact (see, Raines v Byrd, supra, 521 US, at 821, 829).

. Federal courts continue to recognize Kennedy as an application of the narrow rule announced in Coleman (see, Chenoweth v Clinton, 181 F3d 112, 115 [DC Cir]).

. In the dissent’s view, only “a sufficient voting bloc” of legislators who voted for the bills in question could act as plaintiffs in the absence of a Resolution of the Assembly authorizing a lawsuit (dissenting opn, at 547). Under that analysis, it would seem that all who voted for the bills in question would need to join. Thus, a suit could be blocked by one legislator who chose, for whatever reason, not to join in the litigation. Such a result would place too high a bar on judicial resolution of constitutional claims. However, if a “sufficient voting bloc” is less than all legislators who voted for the bill, the injury cannot be characterized as institutional and must be viewed as personal to those who assert the claim.