OPINION OF THE COURT
Bernard J. Malone, Jr., J.
The plaintiff Governor moves and the defendants Assembly *717 and Senate cross-move for summary judgment in this action by the Governor for a judgment declaring unconstitutional 46 budget bills passed by the Assembly and Senate in August 2001.
The Change from a Legislative to an Executive Budget
Prior to 1927, New York had a legislative budget process whereby appropriation bills originated in the Legislature, were referred to committees, and were often passed in the waning hours of the session. It was then left to the Governor, through the veto power, to attempt to trim that which the Governor believed was excessive from that which the Governor believed were the necessary expenditures.
The gathering of financial information for the use by the Legislature in creating a budget was haphazard with over 150 departments, boards and bureaus submitting estimates of their financial needs, which were often characterized by many as grossly excessive in anticipation of budget cuts. Since each senator and assemblyman represented only a limited district the tendency was to look out for the needs of that district with an eye towards reelection. Many felt that the overall financial interests of the people on a statewide basis were often overlooked. Between 1885 and 1914 the spending of the State increased over 600% while the population increased by only 82%.
The Constitutional Convention of 1915
During the Constitutional Convention of 1915, the Committee on State Finances, Revenues and Expenditures Relative to a Budget System for the State (Committee) was directed to study the issue and make appropriate recommendations. The primary mover behind the reform effort was Henry L. Stimson, the Chairman of the Committee on Finance of the Constitutional Convention. The Committee recommended changes to the State Constitution through the implementation of an executive budget process.
The proposed amendments provided that before November 15 of each year each department of the State, except the Legislature and the Judiciary, would submit to the Governor itemized estimates of that department’s financial needs. After holding public hearings, the Governor was to revise those estimates according to the Governor’s judgment. The proposed budgets of the Legislature and the Judiciary were to be submitted to the Governor and passed on to the Legislature without revision but with any recommendation the Governor wished to *718 add. By February 1 of the next year, the Governor was to submit to the Legislature “a budget containing a complete plan of proposed expenditures and estimated revenues” which was to “be accompanied by a bill or bills for all proposed appropriations and reappropriations clearly itemized.” What was to be included in the Governor’s proposed budget was described in detail in the proposed constitutional amendments and the Governor was permitted to amend or supplement the budget before final passage. A copy of the budget was to be given to the Comptroller and he, the Governor and department heads were given the right, and the duty if requested by the Legislature, to appear before the Legislature with respect to the proposed budget. The proposed amendment went on to provide that:
“The Legislature may not alter an appropriation bill submitted by the Governor except to strike out or reduce items therein; but this provision shall not apply to items for the Legislature or judiciary. Such a bill when passed by both Houses shall be a law immediately without further action by the Governor, except that appropriations for the Legislature and judiciary shall be subject to his approval as provided in Section 9 of Article IV.[1]
“Neither House shall consider further appropriations until the appropriation bills proposed by the Governor have been finally acted upon by both Houses; nor shall such further appropriations be then made except by separate bills each for a single work or object which bills shall be subject to the Governor’s approval as provided in Section 9 of Article four. Nothing herein shall be construed to prevent the Governor from recommending that one or more of his proposed bills be passed in advance of the others to supply the immediate needs of Government.”
The Committee determined that the Legislature was not the appropriate body to formulate a budget because, among other reasons, the: “Legislature is under the further disadvantage that its members, instead of being responsible solely to the State as a whole, are each responsible to and dependent upon a single district of the State. A financial program made up in the first instance by the Legislature necessarily tends to represent a compromise or bargain between different districts rather than the viewpoint of the State as a whole. The treatment of the multitude of separate items necessarily tends to that pro *719 cess of give and take which has become so common in America as to be stigmatized by the terms log rolling’ and ‘pork barrel.’ ” (Reprinted in Journal of NYS Constitutional Convention of 1915, at 390-391.)
The Committee decided that the “ultimate responsibility of revising the estimate and preparing the budget must rest with the Governor” because “as the head of the State he is the one who can best explain and defend a given fiscal policy to the people of the State and he is the one who, above all others, is interested in upholding before the people of the State a policy of economy and who should be held responsible to them for the success or failure of such a policy.” {Id. at 396.) Chairman Stimson wrote in support of the amendment as follows:
“We cannot expect economy in the future unless some one man will have to lie awake nights to accomplish it. The only way to stop waste is for the people of the State to know exactly whose fault it is if waste occurs, or if the cost of government steadily rises without compensating increase in service rendered.
“So the proposed Constitution provides that the estimates of all administrative departments shall be first submitted to the Governor, and shall be revised by him. The responsibility for securing an economical and systematic plan for the annual budget of the State is thus laid squarely on his shoulders.
“When the Governor has reduced the estimates he formulates them into a budget, which is simply a financial plan showing how much money is needed and where it should come from, together with balance sheets of the State’s resources and liabilities and statements of the expenditures of past years for the purpose of comparison. He then transmits this budget to the Legislature not later than the first of February. He and his heads of departments have the right to appear before the Legislature and defend this budget. The Legislature has the right to call them and interrogate them about its items. The Legislature can cut down the budget but cannot add to it or raise items and when they act upon the budget their action is final. The responsibility is thus placed squarely upon the Legislature to make the final decision as to how much money shall be appropriated. They cannot swell the appropriation bills in reliance upon the Governor’s veto to prune them down, as so often happens under our present system. The result of this system will be that instead of having appropriation bills reported and passed within the space of a few hours in the close of a session, they will be brought to the attention of the *720 entire State early in the session and will be debated, not in the secrecy of committee, but on the open floor of both houses.
“After the Governor’s budget is passed, a limited power of appropriation is left in the hands of the Legislature, subject to the Governor’s veto. This power will be sufficient to correct a case where the Governor has clearly gone wrong in his budget. But it cannot be made the means of destroying the economies of a good budget without the taxpayers of the State being made aware of it.”
The constitutional amendment implementing the proposed executive budget was defeated at the polls in 1915. However, the budget reform movement continued. In an Introductory Statement to the 1919 Report on Retrenchment of the Reconstruction Commission (at iii) Governor Smith complained, “[h]ow can a Governor be responsible for the administration of over one hundred and fifty agencies scattered all over the State and directed by boards, commissions and individuals whom the Governor in most cases does not appoint and cannot remove?” The Reconstruction Commission recommended a reorganization of State government[2] and the adoption of the executive budget process outlined in 1915. The Reconstruction Commission stated that the “executive budget does not deprive the Legislature of any of its prerogatives” or “make the Governor a czar” because the Governor already had extensive power over finances through the “power to strike out or veto items and whole appropriation bills.” (NY Reconstruction Commn, 1919 Report on Retrenchment, at 316.)
In its 1926 Report, the State Reorganization Commission stated that during the past 15 years seven different attempts were made by statute and administrative practice to prescribe the way the budget should be formulated, all of which were unsuccessful. It further noted that the constitutional amendment passed in November 1925 centralizing in the Governor, acting through the various State departments, supervision over all of the civil and administrative functions of the State, with some exceptions, made it imperative that the executive budget process be enacted and that to do so would require constitutional changes. The Reorganization Commission recommended that the Governor lose the power to veto items in the budget since that power arose when the budget was formulated by the Legislature and would not be necessary under the executive *721 budget process.[3] The Reorganization Commission urged that the amendment proposed by the Constitutional Convention of 1915 be added to the Constitution with the following changes: the date for the submission of the budget should be moved forward; the chairmen and members of the appropriate legislative committees should be allowed to attend the hearings on the revision of estimates; the Governor’s power to amend or supplement as of right should be limited to 30 days after the submission of the original budget proposal and the ability to amend the budget should be made more flexible; the Governor should have the privilege, but not the duty, to attend legislative hearings upon the budget; and the right to initiate new items of appropriations should not be limited to new single purpose bills after the disposition of the budget bill, but should include the right to add new items of appropriation to the original bill.
In 1926, the voters approved the constitutional changes implementing the executive budget as article IV-A of the NY Constitution. Quickly, litigation ensued. In People v Tremaine (252 NY 27 [Tremaine i]) the Governor submitted a proposed budget that contained many lump-sum appropriations for certain administrative departments with provisions that the Governor would be the sole approving authority over how the lump-sum appropriations would be segregated. The Legislature struck from the Governor’s budget bill all of the items to which the Governor had attached the provision giving him segregation control. The items in the proposed bill were restated with former section 139 of the State Finance Law[4] applying to some of the lump-sum appropriations and clauses requiring the approval of the chairs of legislative finance committees as to the manner of segregation being applied to other lump-sum payments such as State construction projects. The Governor ap *722 proved the budget bill, but took the position that the segregation clauses requiring the consent of committee chairs were not constitutional. The controversy was submitted to the courts upon an agreed statement of facts. The Court of Appeals held that the segregation clauses were void because the State Constitution prohibited members of the Legislature from holding any other civil appointments. Of interest here, the Court of Appeals stated that if it had reached the issue, it would have ruled that the segregation clauses that the Legislature inserted in the Governor’s budget bill were invalid because under former section 3 of article IV-A of the NY Constitution of 1894 the “legislature may not alter an appropriation bill submitted by the governor except to strike out or reduce items therein” or “add thereto items of appropriation provided that such additions are stated separately and distinctly from the original items of the bill and refer each to a single object or purpose.” The Court of Appeals reasoned that the segregation riders were not the reduction or striking out of items in the Governor’s proposed budget and did not constitute separate and distinct appropriations. Consequently, that Court found that the Legislature lacked the authority to insert the segregation clauses into the Governor’s appropriation bill.
The Constitutional Convention of 1938
During the Constitutional Convention of 1938, it was recommended that the existing article IV-A be repealed and its provisions be inserted into article VII. In addition, some changes were suggested, including the following language in section 6: “No provision shall be embraced in any appropriation bill submitted by the governor or in such supplemental appropriation bill unless it relates specifically to some particular appropriation in the bill, and any such provision shall be limited in its operation to such appropriation.”
The Report of the Committee on State Finances and Revenues of the 1938 Constitutional Convention, in referring to the above-quoted language, stated: “Section 22 of Article III was adopted in 1894 and is designed to prevent the inclusion of riders in appropriation bills. Its language was not conformed when the Executive budget system was adopted, nor was it incorporated in Article IV-A although relating thereto. The proposed amendment incorporates this section in the section relating to appropriation bills and extends its operation to include not only the Governor’s budget bills but any supplemental appropriation bills.”
*723 In the case of Schuyler v South Mall Constructors (32 AD2d 454, 455-456) the Third Department stated that the purpose of the constitutional provision “was to eliminate the legislative practice of tacking on to budget bills propositions which had nothing to do with money matters; that is, to prevent the inclusion of general legislation in appropriation bills.”
In 1939, the case of People v Tremaine (281 NY 1 [Tremaine II]) came before the Court of Appeals. In that case, the Governor submitted a proposed budget and four bills containing all of his proposed appropriations itemized. The appropriation bill for the support of government divided the proposed expenses of each department, division and bureau into the two categories of expenses for personal services and expenses for maintenance and operation. The appropriations for personal services contained a schedule of the amounts available for each position and the maintenance and operation appropriation was similarly itemized. The Ways and Means Committee of the Assembly struck all of the itemized appropriations and substituted a single lump-sum item of appropriation for each department, division and bureau which combined the expenses of maintenance and operation with the expenses of personal service. Although the Governor objected to the changes made by the Legislature upon constitutional grounds, he allowed the appropriation bill to become law so that it could be challenged in the courts. In declaring the budget bill unconstitutional, the Third Department (People v Tremaine, 257 App Div 117, 120) stated: “As we have seen, the powers of the Legislature in respect to annual appropriation bills are clearly defined in section 4 of article VII of the Constitution which we have quoted. The Legislature is forbidden to alter any appropriation bill submitted by the Governor except to strike out or reduce items therein or to add thereto items of appropriation provided that such additions are stated separately and distinctly from the original item of the bill and refer each to a single object or purpose. These restrictions do not destroy the ultimate power of the Legislature over appropriations. It still has control of the purse strings as to public expenditures. It may, by striking out, refuse any appropriation or it may reduce the amount thereof. It may in the budget bill make amounts available for purposes not provided for but it must exercise these powers within the plan of the budget appropriation bill. The prohibition against alteration in itself is necessary to give effect to other limitations. If the appropriation bill submitted by the Governor can be reconstructed in altered form it becomes *724 impossible for the Legislature to act as the Constitution has directed by reducing and striking out items thereof. It is obvious from an examination of the bill passed by the Legislature that it goes much further than striking out items or reducing items or adding items of appropriation. In effect it destroys the executive budget completely and substitutes therefor a legislative bill. In other words, the Legislature completely emasculated the Governor’s appropriation bill.”
In affirming the above-quoted reasoning, the Court of Appeals (at 11) stated: “Again, the Legislature may not alter an appropriation bill by striking out the Governor’s items and replacing them for the same purpose in different form. Thus reads the fundamental law binding on us all, Judiciary, Governor, Legislature. It may, however, add items of appropriation, provided such additions are stated separately and distinctly from the original items of the bill and refer each to a single object or purpose. The items thus proposed by the Legislature are to be additions, not merely substitutions.”
The budget process was again before the Court of Appeals in 1971 in the case of Hidley v Rockefeller (28 NY2d 439) in which the Legislature significantly cut down the amount of money requested by the Governor, causing the termination of some State employees. Some terminated employees sued, contending that the appropriation acts and the budget violated the NY Constitution because the appropriations consisted of lump sums instead of itemized appropriations and because they contained improper transfer provisions, permitting funds appropriated for one purpose to be used for another at the discretion of a member of the Executive Branch. The majority dismissed the action for lack of standing. In a dissenting opinion, Judge Breitel stated that the degree of itemization of proposed appropriations was an issue beyond judicial review because he believed that it was a matter to be decided by the Governor and the Legislature, and if the itemization was not sufficient for the Legislature, the remedy of the Legislature was to either strike out the item or require greater detail. With respect to transfer provisions, Judge Breitel stated that such provisions can validly be placed in a proposed budget and appropriation bills by a governor and if the Legislature determines that the transfer provisions give the Executive too much discretion it can decline to pass the budget and appropriation bills.
Seven years later, those positions of Judge Breitel prevailed in the Court of Appeals in the case of Saxton v Carey (44 NY2d *725 545). The plaintiffs in that case again argued that the budget and appropriation bills were defective for lacking the required itemization and because they contained transfer provisions. The Court of Appeals, citing the Breitel dissent in Hidley, held that the degree of itemization was beyond court review if the Legislature approved the budget and appropriation bills and that transfer provisions were permissible if approved by the Legislature. Significantly, the Court of Appeals (at 551) stated: “The courts will always be available to resolve disputes concerning the scope of that authority which is granted by the Constitution to the other two branches of the government. Today, we simply refuse to extend the power of the robe into an arena in which it was never intended to play a role. We hold only that the degree of itemization and the extent of transfer allowable are matters which are to be determined by the Governor and the Legislature, not by judicial fiat.”
In the 1993 case of New York State Bankers Assn. v Wetzler (81 NY2d 98) the Governor submitted an appropriation bill containing a request for funds for the Department of Taxation and Finance to conduct audits of banks. The Legislature passed the bill but added a provision authorizing the assessment of fees against the audited banks to cover the expenses of the audits. An association representing the affected banks brought an action to declare the assessment fee provision illegal, in violation of section 4 of article VII of the NY Constitution, which limits the Legislature in dealing with an appropriation bill submitted by the Governor to striking out or reducing an item or adding an entirely new item of appropriation. In an opinion by Judge Hancock, the Court of Appeals affirmed the striking down of the assessment fee provision, stating (at 104-105) as follows:
“[A]rticle VII, § 4 is not, as defendant suggests, a mere procedural requirement in a constitutional process aimed at facilitating agreement in adopting the budget, a requirement which may be waived if the executive and legislative branches agree on it. To the contrary, article VII, § 4 is part of a constitutional scheme for adoption of the budget under which, in general, the Governor is required to initiate and propose the budget legislation.
“Article VII, § 4 is an exception. It constitutes a limited grant of authority from the People to the Legislature to alter the budget proposed by the Governor, but only in specific instances. The constitutional command is unambiguous. The Legislature ‘may not alter an appropriation bill * * * except to strike out *726 or reduce items therein, but it may add thereto items of appropriation’ (NY Const, art VII, §4 [emphasis added]). The Audit Fee Provision was adopted in violation of this command.”
The New York Constitution
The State’s current version of the executive budgeting system is set forth in sections 1 through 6 of article VII of the NY Constitution, as follows:
“[!.] For the preparation of the budget, the head of each department of state government, except the legislature and judiciary, shall furnish the governor such estimates and information in such form and at such times as he may require, copies of which shall forthwith be furnished to the appropriate committees of the legislature. The governor shall hold hearings thereon at which he may require the attendance of heads of departments and their subordinates. Designated representatives of such committees shall be entitled to attend the hearings thereon and to make inquiry concerning any part thereof.
“Itemized estimates of the financial needs of the legislature, certified by the presiding officer of each house, and of the judiciary, approved by the court of appeals and certified by the chief judge of the court of appeals, shall be transmitted to the governor not later than the first day of December in each year for inclusion in the budget without revision but with such recommendations as he may deem proper. Copies of the itemized estimates of the financial needs of the judiciary also shall forthwith be transmitted to the appropriate committees of the legislature.
“[2.] Annually, on or before the first day of February in each year following the year fixed by the constitution for the election of governor and lieutenant governor, and on or before the second Tuesday following the first day of the annual meeting of the legislature, in all other years, the governor shall submit to the legislature a budget containing a complete plan of expenditures proposed to be made before the close of the ensuing fiscal year and all moneys and revenues estimated to be available therefor, together with an explanation of the basis of such estimates and recommendations as to proposed legislation, if any, which he may deem necessary to provide moneys and revenues sufficient to meet such proposed expenditures. It shall also contain such other recommendations and information as he may deem proper and such additional information as may be required by law.
“[3.] At the time of submitting the budget to the legislature the governor shall submit a bill or bills containing all the *727 proposed appropriations and reappropriations included in the budget and the proposed legislation, if any, recommended therein.
“The governor may at any time within thirty days thereafter and, with the consent of the legislature, at any time before the adjournment thereof, amend or supplement the budget and submit amendments to any bills submitted by him or submit supplemental bills.
“The governor and the heads of departments shall have the right, and it shall be the duty of the heads of departments when requested by either house of the legislature or an appropriate committee thereof, to appear and be heard in respect to the budget during the consideration thereof, and to answer inquiries relevant thereto. The procedure for such appearances and inquiries shall be provided by law.
“[4.] The legislature may not alter an appropriation bill submitted by the governor except to strike out or reduce items therein, but it may add thereto items of appropriation provided that such additions are stated separately and distinctly from the original items of the bill and refer each to a single object or purpose. None of the restrictions of this section, however, shall apply to appropriations for the legislature or judiciary.
“Such an appropriation bill shall when passed by both houses be a law immediately without further action by the governor, except that appropriations for the legislature and judiciary and separate items added to the governor’s bills by the legislature shall be subject to his approval as provided in section 7 of article IV.
“[5.] Neither house of the legislature shall consider any other bill making an appropriation until all the appropriation bills submitted by the governor shall have been finally acted on by both houses, except on message from the governor certifying to the necessity of the immediate passage of such a bill.
“[6.] Except for appropriations contained in the bills submitted by the governor and in a supplemental appropriation bill for the support of government, no appropriations shall be made except by separate bills each for a single object or purpose. All such bills and such supplemental appropriation bill shall be subject to the governor’s approval as provided in section 7 of article IV.
“No provision shall be embraced in any appropriation bill submitted by the governor or in such supplemental appropriation bill unless it relates specifically to some particular ap *728 propriation in the bill, and any such provision shall be limited in its operation to such appropriation.”
The Issues before this Court
The controversy before this court began with the submission by the Governor to the Legislature on January 16, 2001 of his proposed budget and the appropriation and supporting bills to implement that budget. Senate bills 900 to 905 were appropriation bills as follows: S 900 was the Legislative and Judiciary Budget Bill; S 901 was the Debt Service Budget Bill; S 902 was the Public Protection and General Government Budget Bill; S 903 was the Transportation and Economic Development Budget Bill; S 904 was the Health, Mental Hygiene and Environmental Conservation Budget Bill; and S 905 was the Education, Labor and Family Assistance Budget Bill. Senate bills 1145 to 1149 contained the legislation proposed by the Governor to implement his budget. In a timely manner, the Governor submitted amendments to the budget submission. On March 29, 2001, the Legislature passed S 900 and the bill was approved by the Governor on March 30, 2001. On July 30, 2001, both Houses made substantial amendments and alterations to the Governor’s remaining nine budget bills and printed amended versions of the bills containing those changes. On July 30 and 31 of 2001, the Legislature introduced in both Houses 37 single-purpose bills making appropriations.
On August 2, 2001, the Legislature passed the altered and amended versions of the nine budget bills, and on the same and the next day passed the 37 single-purpose bills. The Governor protested the constitutionality of the actions of the Legislature but signed them into law. The Governor now contends that the alterations and amendments made by the Legislature were in violation of section 4 of article VII and that the 37 single-purpose appropriation bills were for the same purpose, and that they merely replaced the items of appropriation submitted by the Governor. The Governor contends that the Legislature created and passed its own budget in violation of the provisions of article VII of the NY Constitution.
This declaratory judgment action was commenced by the Governor against the Senate, the Assembly and the Comptroller on August 16, 2001. The Comptroller’s motion to dismiss the action against him was granted. An application to intervene was denied. The parties agreed to an expedited motion and briefing schedule and all agree that the issues raised present questions of law amenable to summary judgment resolution.
*729 The court will first address the affirmative defenses. The Assembly pleads the following affirmative defenses: the causes of action in the complaint subvert the constitutional immunity granted to members of the Assembly; the Governor’s claims are not justiciable; the complaint fails to state a cause of action; and the claims are barred by the doctrine of unclean hands. The Senate pleads as affirmative defenses that the complaint fails to state a cause of action and that the claims are nonjusticiable.
Clearly, under the Saxton and State Bankers decisions the complaint states viable causes of action asserting unconstitutional conduct on the part of the Legislature in violation of the mandates of article VII of the NY Constitution. If strangers to the budget process, as were the plaintiffs in Saxton and State Bankers, can allege viable causes of action premised upon violations of article VII, certainly the participants in that process have similar causes of action for like conduct.
The asserted defense of immunity appears premised upon section 11 of article III of the NY Constitution which provides, “For any speech or debate in either house of the legislature, the members shall not be questioned in any other place.” The section appears to grant a privilege to the individual members of the Senate and Assembly and does not speak to an institutional immunity. No individual member of either House is a defendant in this action. Moreover, the Court of Appeals has spoken recently of the need for judicial review in budget disputes between the Governor and the Legislature upon constitutional issues (Silver v Pataki, 96 NY2d 532), and otherwise facially inapplicable provisions, such as section 11 of article III of the NY Constitution, are not going to be applied by this court to bar such review.
As to justiciability, budget disputes of this nature do present a justiciable controversy (Silver v Pataki, supra; New York State Bankers Assn. v Wetzler, 81 NY2d 98, supra; Saxton v Carey, 44 NY2d 545, supra). To the extent that the Assembly’s affirmative defenses of nonjusticiability and unclean hands are premised upon the failure of the Governor to veto the bills, and in fact sign the bills into law, those defenses lack merit. In Tremaine II (257 App Div 117, 120, supra) the Governor allowed the budget bills to become law “for the sole purpose of having this issue of constitutionality presented to the courts for judicial decision” and that action on his part did not render the dispute nonjusticiable. In fact, the course chosen by the Governor is the preferred course of proceeding in budget *730 disputes of this nature (Winner v Cuomo, 176 AD2d 60) and is not the type of conduct covered by the doctrine of unclean hands. Accordingly, the Governor is awarded summary judgment dismissing the affirmative defenses asserted in the answers of the Senate and Assembly.
Returning to the deletions, amendments and alterations complained of by the Governor, the deletions complained of occurred in Senate bills 902, 903, 904 and 905 and consisted generally of: deleting provisions requiring that the Director of the Budget issue certificates of availability before funds appropriated in the bills may be expended; deleting provisions specifying how appropriated educational funds would be distributed; deleting provisions that would have deducted disallowances from the payment of remaining school aid obligations for the 2000-2001 school year; deleting provisions on how funds appropriated for health care would be distributed; deleting provisions allowing the interchange of appropriated funds; deleting from the Medicaid appropriation provisions that would have limited the amount of reimbursements available to certain program providers; deleting provisions that would have permitted transfer and suballocation authority for funds appropriated from specified Special Revenue funds; and deleting provisions allowing flexibility to transfer appropriated Federal Aid to Localities funds to State Operations funds.
The alleged legislative substitutions for items proposed by the Governor occurred in Senate bills 902, 903, and 905 as follows: $19.6 billion of proposed appropriations and reappropriations for capital projects were deleted and replaced with a single $1.1 billion lump-sum appropriation in S 902-B for the general purpose of capital projects initiated in prior years and limited to liabilities incurred through August 31, 2001; the Governor’s proposed items of appropriation for assistance to needy families, arts, state museum and state archives were deleted and replaced in different forms and with different terms in the 37 single-purpose appropriation bills passed by the Legislature after passage of the Governor’s budget bills; and the Governor’s appropriation for the proposed Office of Cultural Resources was deleted and replaced by numerous appropriation bills for cultural education programs with the funds to be dispersed by the State Education Department.
As to alleged repetition and subsequent alteration the Governor asserts that the Legislature altered his proposed items of appropriation by enacting the amended versions of his proposed appropriation bills and then changing the purposes, *731 terms and conditions of spending the appropriated funds in the subsequently passed single-purpose appropriation bills and gives as some examples the following: the proposed appropriation for the State University of New York was directed in the Governor’s bill to be used for services and expenses related to collective bargaining agreements, inflation, full-time faculty positions, and other priority needs identified by the Board of Trustees and the Legislature appropriated the sum requested by the Governor but then in a subsequent single-purpose bill directed that the money be used only for collective bargaining agreements and enrollment growth; the reduction and alteration of the appropriation for the Division of the Lottery by directing that funds could not be used for four purposes specified by the Governor; a direction in one of the single-purpose appropriation bills that the appropriation of federal school aid funds could not be used for school renovation as proposed in the Governor’s bill; and alterations in single-purpose bills of the Governor’s appropriations for programs administered by the Offices of Real Property Services, spending and capital bonding for dormitory renovation and rehabilitation at SUNY campuses, and certain expenses of the City University of New York.
The Governor’s arguments, set forth in the briefs submitted by his counsel, are as follows: his appropriation bills can contain language directing the “when, how and where” of spending even if those directions conflict with existing law; pursuant to section 4 of article VII the Legislature may not alter the Governor’s appropriation bills by deleting the “when, how and where” language as it is limited to striking out or reducing items of appropriation or including single-purpose separate items of appropriation; the remedies of the Legislature upon disagreeing with the “when, how and where” set forth in the Governor’s appropriation bills are to delete the proposed appropriation completely or refuse to act upon the bills compelling, at some point, a compromise; the “when, how and where” language objected to by the Legislature meets the dictates of section 6 of article VII because the provisions relate specifically to the involved appropriations and are limited in operation to each specific appropriation; interchange provisions have been approved by prior Court of Appeals decisions to be appropriately included in appropriation bills; the Legislature may not do indirectly what it is prohibited from doing directly and its actions in amending the Governor’s appropriation bills and changing “when, how and where” the appropriated funds *732 would be spent through the subsequently enacted single-purpose bills violates the restrictions upon its powers set forth in section 4 of article VII and would return the State to a legislative budgeting process rather than the executive process enacted by the people through article VII; and the Legislature violated section 5 of article VII by considering the 37 single-purpose appropriation bills prior to final action upon the Governor’s proposed budget bills.
The positions of the Assembly, explained in the briefs submitted by its counsel, are as follows: the Governor cannot contest the validity of legislation he personally signed into law; the Governor’s appropriation bills contained general provisions and substantive law provisions, such as the interchange and budget certification provisions, which are not permitted in appropriation bills; the use of interchange provisions effectively nullifies itemization and created an impermissible lump-sum budget; the Legislature has the authority to delete provisions in appropriation bills which do not constitute items of appropriation, enact the Governor’s appropriation bills without the deletions, and add appropriations through single-purpose bills so long as the subjects of those bills are not “exactly” the same as the Governor’s proposals by differing in terms and conditions of how the appropriations are used; the “when, how and where” language should have been, included in the Governor’s “programmatic” budget bills accompanying the appropriation bills and the Legislature has unfettered discretion to amend and alter such bills in any manner that it sees fit; and the Governor’s appropriation bills were finally acted upon before the single-purpose bills were considered and passed.
The legal arguments of the Senate, as set forth in the briefs submitted by its counsel, are as follows: the appropriation bills submitted by the Governor improperly contained substantive, programmatic provisions in violation of article VII which the Legislature was free to strike out; an appropriation bill can only contain items of appropriation (dollar amounts) and a brief description of the purpose of the appropriation and proposed substantive law changes are to be placed in the “programmatic” bills accompanying the appropriation bills; section 6 of article VII does not apply to appropriation bills submitted by the Governor and is not authority for the inclusion of the type of “when, how and where” language employed by the Governor in his appropriation bills; the Legislature properly deleted the “when, how and where” language from the bills, enacted the amended bills with the deletions, and there *733 after passed the 37 single-purpose bills; and the Governor’s “no-substitution” rule has no constitutional or case law basis.
This court agrees with the analysis of counsel for the Senate that the two issues critical to the determination of this case are first, what proposals may properly be included by the Governor in an appropriation bill and, second, may the Legislature strike out what it finds to be extraneous, nonappropriation measures from the Governor’s proposed budget. Determination of the first issue requires interpretation of sections 2 and 3 of article VII of the NY Constitution. In interpreting article VII the guiding factors are the language of the sections under review and “the intent of the framers of the Constitution” (Anderson v Regan, 53 NY2d 356, 361-364).
Section 2 compels the Governor to submit to the Legislature a “budget containing a complete plan of expenditures proposed” and section 3 requires that at “the time of submitting the budget to the legislature the governor shall submit a bill or bills containing all the proposed appropriations and reappropriations included in the budget and the proposed legislation, if any, recommended therein” (emphasis supplied). The plain and unambiguous language of section 3 gives the Governor the option of submitting a single bill setting forth all proposed appropriations and reappropriations and proposed legislation recommended in the budget or multiple bills accomplishing the same result. The choice of a single bill or multiple bills to submit all appropriations, reappropriations and proposed legislation (ostensibly the “substantive, programmatic provisions” necessary to alter existing law so as to implement the Governor’s “complete plan” of income and expenditures) is given entirely to the Governor. If the position of the defendants that the appropriations and proposed legislation to implement the budget must be set forth in separate bills[5] is adopted by the courts the plain language of section 3 giving the Governor the option of a “single bill or bills” to introduce both appropriations and “proposed legislation” will have been rendered meaningless as the Governor will always be compelled to use multiple bills. A guiding rule of construction is that “[n]o part of an original act or an amendment thereto is to be held inoperative, if another construction will not conflict with the plain import of the language used” (McKinney’s Cons Laws of *734 NY, Book 1, Statutes § 144, at 292-293). The construction given by this court to section 3 of article VII does not render a part of the original enactment thereof, and its 1938 amendment, to be inoperative, as would the defendants’ construction, by removing the option of a single bill encompassing both appropriations and proposed legislation.
If the court looks beyond the literal language of section 3 at the intent of the framers, it must be recognized that the original 1927 version did not contain the language “proposed legislation,” which language was added in 1938 (see, Winner v Cuomo, 176 AD2d 60). Nonetheless, a review of the history of the enactment of the executive budget, especially the writings of Chairman Stimson, leads this court to conclude that the intent of the framers in enacting the executive budget was to place in the hands of the Governor the task of formulating State fiscal policy, with ultimate approval of that policy left to the Legislature, albeit with severe restrictions upon how it can alter the appropriation and spending plans[6] of the Executive, and that an overriding concern of the framers was a fear of a continuance of the legislative budget process.
The framers allowed the Governor the option of placing his or her proposed budget to the Legislature in either a single bill or in multiple bills. When section 3 was modified in 1938 to specifically allow the submission of proposed legislation with the appropriations and reappropriations (for whatever purpose, be it proposed tax legislation or other substantive changes) the members of the Constitutional Convention were charged with knowledge of the existence of the single bill option offered to the Governor by the current language of the section.[7] It would seem inappropriate to conclude that the framers did not intend to mean what they said when by the literal language they care *735 fully chose they gave the Governor the option of submitting his “proposed appropriations and reappropriation included in the budget and the proposed legislation, if any, recommended therein” in “a bill or bills.” (NY Const, art VII, § 3.)
Literal language and intent of the framers aside, on the few prior occasions when the issue has come before New York courts those courts have not limited appropriation bills solely to the statement of dollar amounts and the purpose thereof (Saxton v Carey, 44 NY2d 545, 551, supra [language in appropriation bill allowing intra-program transfer of funds found to have “no constitutional invalidity”]; Schuyler v South Mall Constructors, 32 AD2d 454 [provision in an appropriation bill authorizing the Commissioner of General Services to negotiate a construction contract, while not the statement of a specific sum of money or a description of the purpose of the appropriation, was properly contained in the appropriation bill]; Rice v Perales, 156 Misc 2d 631, 640, mod on other grounds 193 AD2d 1135 [inclusion in appropriation bill of language authorizing the Commissioner of Social Services to enact regulations to reduce fraud and revise budget methodology for mixed households was proper even though language was not the statement of a specific sum or the purpose thereof but appeared to set policy]).
Turning to the second inquiry posed by counsel for the Senate, that is, may the Legislature strike out what it finds to be extraneous, nonappropriation measures from the Governor’s proposed budget, the Court of Appeals is clearly free to fashion a rule that the Legislature has the power to delete unconstitutional language from an appropriation bill, despite the language of section 4 of article VII, but this trial level court does not have such discretion. “Court of Appeals decisions must be followed by all courts of original jurisdiction” and “a trial court must follow an Appellate Division precedent in its own department” (1 Carmody-Wait 2d, NY Prac § 2:274, at 474; § 2:276, at 476).
In the case of People v Tremaine (252 NY 27, supra [Tremaine 7]), the Legislature added unconstitutional segregation provisions to the Governor’s budget bill. In discussing the result if the opposite situation had occurred (the Governor inserting unconstitutional language in his own appropriation bill which was neither the statement of a specific sum nor a de *736 scription of the purpose for the appropriated sum), the Court of Appeals stated, in dictum (at 50), as follows: “A fundamental question presents itself in this connection. If the Legislature may not add segregation provisions to a budget bill proposed by the Governor without altering the appropriation bill, contrary to the provisions of article IV-A, section 3, it would necessarily follow that the Governor ought not to insert such provisions in his bill. He may not insist that the Legislature accept his propositions in regard to segregations without amendment, while denying to it the power to alter them. The alternative would be the striking out the items of appropriation thus qualified in toto and a possible deadlock over details on a political question outside the field of judicial review.”
It appears to this court that by this statement the Court of Appeals said that the Governor should not insert segregation provisions[8] in his appropriation bill because the Legislature lacked the authority to simply strike the unconstitutional language[9] but, instead, could only address the appropriation itself. While recognizing that the above-quoted statement is dictum which is not binding authority upon lower courts, it is language that gives this lower court some pause. However, on the other hand, the language of Judge Hancock in the State Bankers case is not mere dictum and it specifically states that the “constitutional command is unambiguous” (at 104) in directing that the Legislature may not alter the Governor’s appropriation bill except to strike out or reduce specific items of appropriation or add new appropriations. That holding is binding upon this court and requires a holding, at this judicial level, that the actions of the Legislature in deleting the alleged unconstitutional language from the Governor’s budget bills were unconstitutional.
Aside from the Court of Appeals decisions discussed above, the same result reached by this court would seem to be compelled by the Third Department decision in Saxton v Carey (61 AD2d 645, 647, affd 44 NY2d 545), in which the plaintiff alleged that certain language in the Governor’s appropriation bills was unconstitutional, where the Third Department stated that “the Legislature is not empowered to correct the deficien *737 ties” because of the restriction to alterations contained in section 4 of article VII.[10]
The determination of this court does not mean that ultimate control of public spending does not still reside with the Legislature, because if the Legislature decides that the policy proposals advanced by the Governor with respect to how to spend the State’s money as contained in his appropriation bill or bills are not what the law should be, “the remedy is in their hands” (Saxton v Carey, 44 NY2d 545, 551, supra). They can simply fail to enact into law the Governor’s appropriation bills and the resulting deadlock, if a compromise cannot be reached, will cause public pressure to build to the point where these political questions will be settled “in the voting booth” and “not in the courtroom” (supra at 551).
Having determined that the Governor had the authority to include the language in his proposed budget and appropriation bills that was thereafter deleted by the Legislature, it follows that the subsequent enactment by the Legislature of the amended appropriation bills was unconstitutional and, in this court’s view, the enactment of the 37 single-purpose bills was an unconstitutional attempt by the Legislature to “discard the executive budget and write one of its own” (People v Tremaine, 257 App Div 117, 122, affd 281 NY 1).
In view of the determinations of this court in this decision, order and judgment, the court does not reach the other constitutional issues raised by the parties. Judicial policy holds that constitutional issues which need not be decided for a resolution of a dispute should, generally, not be determined (Matter of Clara C. v William L., 96 NY2d 244).
The plaintiff Governor is awarded judgment declaring that the actions of the defendants Assembly and Senate in enacting the 46 budget bills on August 2, 2001 and August 3, 2001 (other than the Legislative and Judiciary Budget Bill) were unconstitutional in violation of article VII of the NY Constitution. The cross motions of the defendants are denied. Implementation of this decision, order and judgment is stayed pending the determination of the next court to which an appeal is taken herefrom.

. The Governor’s veto power.

. Not more than 20 civil departments in the State government (NY Const, art V, § 2), with the Governor given control of those departments.

. The Reorganization Commission stated, “To leave with the Governor his present power of constitutional veto in respect to a budget which he himself has formulated, tends to destroy the Legislature’s sense of responsibility and to turn over to the Governor the purse strings of the State. The only way in which the true order of procedure can be fully established and the Governor relegated to his true function of proposing a budget and the Legislature fully restored to its true function of disposing of that budget, is by passage of a constitutional amendment.”

. The section provided that whenever a State department was created, reorganized or consolidated and a lump-sum appropriation was made for its operation the money appropriated for salaries could not be expended until a schedule of positions and salaries was approved by the Governor, the Chairman of the Finance Committee of the Senate and the Chairman of the Ways and Means Committee of the Assembly.

. This is certainly a practice that could be adopted by a Governor (see, Silver v Pataki, 96 NY2d 532 [discussing appropriation and programmatic bills]), but not one mandated by the plain language of section 3 which offers the option of a single bill or multiple bills.

. Judge Hancock recognized those restrictions in the State Bankers case when he stated (at 104), “Article VII, § 4 is an exception. It constitutes a limited grant of authority from the People to the Legislature to alter the budget proposed by the Governor, but only in specific instances. The constitutional command is unambiguous. The Legislature may not alter an appropriation bill * * * except to strike out or reduce items therein, but it may add thereto items of appropriation.”

. The Third Department in the case of Public Serv. Commn. v New York Cent. R.R. Co. (193 App Div 615, 618) stated the rule of construction as follows: “There is a canon of construction which cogently argues that a rational, sensible and practical construction of a constitution, statute or contract should be preferred to one which is unreasonable, absurd or impracticable. (McPhee & McGinnity Co. v. Union Pacific R. Co., 158 Fed. Rep. 5, 17), and it is always proper to assume that the legislative body has acted with a knowledge of existing laws and constitutions, and that it has intended to produce a *735 harmonious and workable system, without doing violence to constitutional principles.”

. Segregation, provisions are described elsewhere in the decision as “not an item of * * * appropriation but was a piece of independent directory legislation” (id. at 48), the very complaint these defendants have with respect to the language they struck from the Governor’s appropriation bills.

. This is a power that these defendants assert that the Legislature has.

. The determination of a lack of legislative authority was necessary to the decision that the action was not premature, thus rendering the holding to be binding upon this court and not mere dictum.