7 N.Y.3d 256 (2006)
852 N.E.2d 1144
819 N.Y.S.2d 672
In the Matter of COMPTROLLER OF THE CITY OF NEW YORK, Appellant-Respondent,
v.
MAYOR OF THE CITY OF NEW YORK et al., Respondents-Appellants, and
SNAPPLE BEVERAGE CORP., Respondent.
Court of Appeals of New York.
Argued June 6, 2006.
Decided June 29, 2006.
*258 Judd Burstein, P.C., New York City (Judd Burstein, Peter B. Schalk and Matthew G. DeOreo of counsel), for appellant-respondent.
*259 Michael A. Cardozo, Corporation Counsel, New York City (Dona B. Morris, Francis F. Caputo, Jonathan S. Becker, Warren Shaw and Spencer Fisher of counsel), for Mayor of City of New York and others, respondents-appellants.
Shearman & Sterling LLP, New York City (Richard Schwed, Jeremy Epstein and Andrew C. Agor of counsel), for Snapple Beverage Corp., respondent.
Judges G.B. SMITH, CIPARICK, ROSENBLATT, GRAFFEO, READ and R.S. SMITH concur.

*260 OPINION OF THE COURT
Chief Judge KAYE.
In July 2003, in a novel revenue-raising venture, the City of New York created the Marketing Development Corporation (MDC), to develop innovative public-private partnershipsusing the City's well-known image and resourcesto promote New York City around the globe and generate jobs, revenue and tourism. The dispute before us centers on a concession contract between the City, MDC and the Department of Citywide Administrative Services (collectively, the City), and Snapple Beverage Corporationa marketer of popular beveragesin which Snapple drinks would be offered for sale in vending machines on City property, and Snapple through its own initiatives would market the City brand.
When the City presented only the vendingnot the marketingportion of the contract to the New York City Franchise and Concession Review Committee (FCRC) for a public hearing on December 8, 2003 and approval two days later, the Comptroller balked.[1] The City then sent the concession agreement to the Comptroller for registration on February 20, 2004, and the Comptroller objected by letter on March 18, 2004. Citing New York City Charter § 328 (b) (ii) and (c), the Comptroller's concerns rested on two grounds. First, he asserted that the agreement was tinged with official corruption on the part of City officials at MDC. Second, he alleged that filings by the Mayor and the Corporation Counselcertifying that the procedures for soliciting the agreement were followed, and that the agency had the legal authority to award the contractwere improper because only the vending portion of the contract had been submitted for approval to FCRC. Only the second allegation is at issue on this appeal.
*261 By letter dated April 12, 2004, the Mayor responded to the Comptroller, directing him to register the contract pursuant to New York City Charter § 328 (c). On April 21, 2004, the Comptroller brought this combined special proceeding (CPLR art 78) and declaratory judgment action (CPLR 3001), seeking annulment of the contract with Snapple, a declaration that the contract was invalid and could not be implemented, and a declaration that New York City Charter § 362 (a) (defining "concession") includes intangible property. The Comptroller sought summary judgment declaring that section 362 (a) applies to all types of property; the City cross-moved for summary judgment dismissing the proceeding in its entirety and raised a statute of limitations defense.[2]
Supreme Court determined that the entire contract had been filed, and Charter § 328 (b) (ii) did not permit the Comptroller to raise an objection attacking only part of it.[3] The court rejected the City's statute of limitations defense, concluding that the last actions the Comptroller challengedthe filing of the contract on February 20, 2004, and the Mayor's overruling of his objections on April 12, 2004were within four months of the commencement of the proceeding for article 78 review and the declaratory judgment claim that grew out of it. Concluding that the statute of limitations had not yet begun to run on the claim regarding the definition of property, the court held that Charter § 362 (a), defining "concession" as "a grant made by an agency for the private use of city-owned property for which the city receives compensation," did not limit the meaning of "property" to "real property" but included intangible property. The court observed that numerous other Charter provisions used the terms "real" or "personal" when narrowly defining the term property, but section 362 (a) did not and thus the word "property" should be construed broadly to include intellectual property.
The Appellate Division unanimously affirmed, concluding that Charter § 328 (b) (ii) permitted the Comptroller to object only to the existence or nonexistence of the certifications, not to *262 look beyond them to inspect the underlying process. Additionally, the Court agreed that the term "property" under Charter § 362 (a) includes intangibles such as intellectual property, recognizing that although the legislative history of the City Charter provision and concessions indicated the provision had been applied predominantly to real property, there was no sign of an intent to so limit its application.[4] We now affirm.
As a preliminary matter, we reject the contention advanced by the City and Snapple that the statute of limitations bars the Comptroller's claim that the contract is invalid because it could not be registered properly under Charter § 328. We disagree that December 10, 2003the date of the FCRC votewas the trigger date for the statute of limitations. As noted recently in Matter of Best Payphones, Inc. v Department of Info. Tech. & Telecom. of City of N.Y. (5 NY3d 30, 34 [2005]), there are two requirements for determining when an agency action is "final and binding upon the petitioner" for article 78 statute of limitations purposes (see CPLR 217 [1]): the agency must have arrived at a definite position on the issue inflicting actual injury, and the injury may not be significantly ameliorated either by further administrative action or steps taken by the complaining party (id. at 34; see also Matter of City of New York [Grand Lafayette Props. LLC], 6 NY3d 540 [2006]).
Here, the agency determination became "final and binding" no earlier than February 20, 2004, the date the City filed the contract with the Comptroller for registration. At that point, the alleged procedural infirmity upon which the Comptroller bases his argument became irrevocablethe contracting parties had executed and filed a final, formal agreement subject to registration under section 328 (b). There was no further ameliorative administrative action expected, and the only steps left for the Comptroller were to set forth his objections on the ground that certification had not been made (§ 328 [b] [ii]), and to bring suit.
We agree with the City and Snapple, however, that the statute of limitations bars the Comptroller's additional claim that the contract is void based on the Mayor's failure to obtain total FCRC approval. That claim stems not from any injury asserted by the Comptroller under the Charter, but essentially from his role as an aggrieved voting member of the FCRC. On that claim, the statute began to run on December 8, 2003the *263 date the Mayor refused to submit the marketing portion of the contract to the FCRC. After that date, no further FCRC actionwith respect to the marketing portion of the contractor steps taken by the Comptroller, other than his vote, were anticipated.[5]
Turning to the substantive questions, we hold that under settled statutory interpretation principles, the term "property" in Charter § 362 (a) is not limited to "real property."[6] Those same principles of statutory interpretation, however, compel the conclusion that the Comptroller may not, under Charter § 328 (b) (ii), transform a procedure for registering a contract into a substantive investigation of a contract.
Whether the term "property" in section 362 (a) should be limited to real property is, we acknowledge, a close question. Indeed, following approval of the Charter by the voters, Charter drafters Frederick A.O. Schwarz, Jr. (chair of the New York City Charter Revision Commission [NYCCRC] established in January 1989) and Eric Lane (NYCCRC's executive director and counsel) observed that,
"[t]he City possesses inalienable rights to its streets, highways, avenues, parks, wharves, and other public property. There is enormous demand for the use of this property. Through franchises, revocable consents, concessions, and licenses, the City has established techniques to grant permits to private entrepreneurs, such as cable, bus, and ferry companies; *264 restaurants; and newspaper purveyors, for use by the city's residents. The distinction among these uses provokes uncertainty, but we offer our view (which is now part of the Charter), and caution as Schwarz stated at one public meeting: `[N]either the King nor the deity, in fact, has laid down immutable rules on what is a franchise, and what is a concession, and what is a revocable consent'" (Schwarz and Lane, The Policy and Politics of Charter Making: The Story of New York City's 1989 Charter, 42 NYL Sch L Rev 723, 873 and n 519 [1998]).
The City makes a plausible argument that the term "property" as it relates to concessions, when analyzed within its historical and legislative context, was meant to refer only to real property. Perhaps the City's most favorable evidence that the current Charter's drafters intended the narrower meaning of "property" is found in a June 29, 1989 draft of what became section 362 (a), defining concession to mean: "a grant made by any agency for the operation or management of an enterprise for profit on city-owned property for which the city receives compensation" (see June 1989 Revised Proposals of NYCCRC [emphasis added]). This sentence, the City maintains, must employ the term "property" to refer to real property, because it is impossible to manage or operate a business "on" intangible property. The Comptroller counters, however, that the drafters removed the word "on" from the provision, thereby demonstrating some intent not to limit the types of property covered by section 362 (a).
We choose to construe the term "property" in accordance with the clear legislative language recognizing that, should the City see fit, it may seek amendment of the Charter provision to reflect a narrower view of the term. It is fundamental, of course, that we turn first to the text itself when interpreting a statute, as the best evidence of legislative intent. Generally, unambiguous language is determinative, and courts must give effect to the plain meaning of a statute's terms (see Matter of Theroux v Reilly, 1 NY3d 232, 239 [2003]). The terms here could not be clearer: "`[c]oncession' shall mean a grant by an agency for the private use of city-owned property" (§ 362 [a] [emphasis added]). The only qualifier of the term "property" in this definition is "city-owned"not real, not personal, not tangible or intangible. Black's Law Dictionary states that "property" is *265 "commonly used to denote everything which is the subject of ownership, corporeal or incorporeal, tangible or intangible, visible or invisible, real or personal" (at 1095 [5th ed 1979]). We see no reason to limit "property" any more than the drafters have.
As the Comptroller emphasizes, when the drafters of the Charter meant "real property" in section 362, they used those words. For example, section 362 (d), defines the term "Revocable Consent" and twice uses the term "real property," in contrast to "inalienable property":[7]
"`Revocable Consent' shall mean a grant by the city of a right, revocable at will, (1) to any person to construct and use for private use pipes, conduits and tunnels under, railroad tracks upon, and connecting bridges over inalienable property, (2) to an owner of real property or, with the consent of the owner, to a tenant of real property to use adjacent inalienable property for such purposes as may be permitted by rules of the department of transportation or the department of information technology and telecommunications or (3) to a public service corporation for facilities ancillary to, but not within, a franchise granted prior to the effective date of this section."
Thus, within section 362 as a whole, the drafters took care to define the term "property" in no less than three distinct ways real property (§ 362 [d]), inalienable property (§ 362 [d]) and City-owned property (§ 362 [a]). Moreover, there are more than 50 other sections of the Charter expressly referring to "real property"not "property." We conclude that the drafters' decision not to use the term "real property" in section 362 (a) indicates that they did not intend the narrower construction.
The Comptroller also posits that in those sections where the drafters intended for property-related terms to have meanings that might vary from their commonly accepted meanings, they said so explicitlyin section 210 (8), for example, the drafters made clear that the term "real property" should include items such as liens and easements that are not generally viewed as real property (see also Charter § 1150 [12]). Thus, time after *266 time, the drafters purposefully chose the term "real property" when that term was intended, and specially defined it or did not use it at all when something else was intended.
Nor is it inconsistent that some sections of the Charter contemplate that many concessions will in fact be located on City-owned real property. For example, section 373 (a) requires the borough president (or designee) "in which such ... concession is located" to serve on the FCRC reviewing the proposed concession (see also § 374 [b] [defining "major concessions" as those having "significant land use impacts and implications"]). Naturally, the drafters would envision concessions affecting real propertythe likely majority of City-owned propertyand craft the Charter provisions accordingly. As this Court perceived more than a century ago in Hudson Riv. Tel. Co. v Watervliet Turnpike & Ry. Co. (135 NY 393, 403-404 [1892]), however,
"[t]he words of the statute are to be interpreted according to their natural and obvious meaning, and, as the terms employed are not ambiguous, extrinsic facts are not available to restrict the authority which it plainly confers.... It would be an unjust reflection upon the wisdom and intelligence of the law-making body to assume that they intended to confine the scope of their legislation to the present, and to exclude all consideration for the developments of the future. If any presumption is to be indulged in, it is that general legislative enactments are mindful of the growth and increasing needs of society, and they should be construed to encourage, rather than to embarrass the inventive and progressive tendency of the people."
Former Mayor Edward I. Koch advised the drafters, moreover, that with respect to concessions, franchises and revocable consents it was essential that the new Charter recognize "different uses, warranting different levels of executive and legislative review ... [and that] the new Charter be open-ended and flexible, recognizing that technological and economic developments will inevitably expand or alter the universe of uses" (Mem of Mayor of City of NY Edward I. Koch to NYCCRC, dated June 5, 1989). Therefore, the former Mayor cautioned, "the Charter should speak in general categories rather than relying exclusively on current labels or activities" (id.). As a result of our holding, FCRC review will occur for concession contracts involving intangible, as well as real City-owned property. Thus, *267 as a policy matter, our interpretation of section 362 (a) is also consistent with the underlying goals of the Charter, to ensure transparency in the governmental process, and adequate checks and balances (see e.g. Schwarz and Lane, 42 NYL Sch L Rev at 739-743).
Applying those same general principles of statutory construction, as the City now urges, we must reject the Comptroller's position that under section 328 (b) (ii), he was entitled to inspect the process by which the City came to its agreement with Snapple.
Two provisions of the Charter are in issue. Section 327 (certification of legal authority and procedural requisites) requires that contracts not let by competitive sealed bidding must be certified, prior to filing with the Comptroller, by the Mayor and the Corporation Counsel (see Charter § 327 [a], [b]). Section 328 (registration of contracts by the Comptroller) provides that the Comptroller need not register the contract when certification pursuant to section 327 has not been made (see Charter § 328 [b] [ii]). On its face, section 328 (b) (ii) simply requires registration unless certification did not occur.
In this instance, the Comptroller argues rather circuitously that he need not comply with his statutory obligation to register the contract. He asserts that the City never submitted the marketing portion of the Snapple agreement to FCRC for review; that the mayoral certification under section 327 (a) that "the procedural requisites for the solicitation and award of the contract have been met" is untrue; and he therefore cannot be compelled to register the contract under section 328 (b) (ii).
The Comptroller may deny registration, however, only if "a certification required by [section 327] has not been made" (§ 328 [b] [ii]). The Comptroller's review as to section 327 certifications is explicitly limited by the plain terms of the statute. Section 328 (b) (ii) does not give the Comptroller the power to second-guess facially sufficient certifications provided by the Mayor and the Corporation Counsel. The delegation of duties set forth in the relevant provisions of the Charter establishes in plain language that the Mayor and the Corporation Counsel not the Comptrollerbear the burden of determining that procedural requirements have been met and legal authority exists to award a concession contract. Thus, there is no reason to annul the Snapple contract.
*268 Accordingly, the order of the Appellate Division should be affirmed, without costs. The certified question should not be answered upon the ground that it is unnecessary.
Order affirmed, etc.
NOTES
[1] A voting member of the FCRC, the Comptroller cast his ballotvia designeeagainst the contract in a 4-2 vote to approve it.
[2] Snapple also cross-moved for this relief but, having failed to answer the petition, it was not, in Supreme Court's view, entitled to summary judgment.
[3] To the extent that the Comptroller raised other objections to the certifications, such as the failure of the Mayor and the Corporation Counsel to certify the contract properly before it was filed, the court found those objections waived because they were not timely raised in the Comptroller's March 18, 2004 letter. That determination is not before us on appeal.
[4] The court did not address the City's statute of limitations defense.
[5] Snapple additionally alleges that the Comptroller lacks capacity and standing to bring the claims alleged. The lower courts did not pass on these claims and the City does not join in Snapple's arguments. We conclude Snapple's claims are meritless. The Comptroller has the "functional responsibility within the zone of interest to be protected"here, to insist upon certifications before registering a contract (see Silver v Pataki, 96 NY2d 532, 537 [2001]) and thus has capacity to sue. It also seems clear that the Comptroller has standing to raise the issue whether, under section 328 (b), he may refuse to register a contract and prohibit the Mayor from implementing it on the grounds alleged. Certainly, the Comptroller has shown the existence of a cognizable "injury" falling within his zone of interest (96 NY2d at 539).
[6] Charter § 362 (a), found in chapter 14: "Franchises, Revocable Consents and Concessions," states that:

"For the purposes of this charter:
"a. `Concession' shall mean a grant by an agency for the private use of city-owned property for which the city receives compensation other than in the form of a fee to cover administrative costs, except that concessions shall not include franchises, revocable consents and leases."
[7] Charter § 383 provides that "[t]he rights of the city in and to its water front, ferries, wharf property, bridges, land under water, public landings, wharves, docks, streets, avenues, highways, parks, waters, waterways and all other public places are hereby declared to be inalienable."