WILSON, J. (concurring).
I subscribe fully to the Court's answer to the second certified question. I write separately because I do not view the first certified question as involving an issue of "capacity," even though a few of our decisions describe it that way. Nor do I view it as a question of when a public benefit corporation should be treated as if it were the State. The question, as I see it, is whether and under what circumstances a public benefit corporation can challenge a legislative act as unconstitutional. That is not a question of capacity, which has a firm and long-standing legal meaning relating to the binary ability to sue and be sued (or not), but of the power of a legislatively-created entity to challenge an action of its creator. The answer to that question is derived from the structure of government and the roles of the coordinate branches. We have most often articulated that doctrine not as one of capacity, but of "standing" or "power," which comes closer to describing the forces at work here.
The general presumption that legislatively created entities cannot challenge acts of the legislature derives from "the supreme power of the Legislature over its creatures" (Black Riv. Regulating Dist. v. Adirondack League Club, 307 N.Y. 475, 488, 121 N.E.2d 428 [1954] ["political power conferred by the Legislature confers no vested right as against the government itself"] ). That presumption is rooted in the structure of government; legislatively-created entities, such as public benefit corporations, are subservient political entities. An entity's power is given by the legislature, and "[h]ow long it shall exist or how it may be modified or altered belongs exclusively to the people to determine" ( id. at 488, 121 N.E.2d 428 ). Accordingly, it is the rare case when the entity may challenge an act of the legislature. Admittedly, our decisions have not always been *1248 clear in terminology; from time to time, we have muddied the waters. The appropriate response ***407 today, as requested by the United States Court of Appeals for the Second Circuit, is to clear away the mud.
I.
"There is a difference between capacity to sue, which is the right to come into court, and a cause of action, which is the right to relief in court. Incapacity to sue exists when there is some legal disability, such as infancy or lunacy or a want of title in the plaintiff to the character in which he sues. The plaintiff was duly appointed receiver and has a legal capacity to sue as such, and, hence, could bring the defendants into court by the service of a summons upon them even if he had no cause of action against them. On the other hand, an infant has no capacity to sue, and, hence, could not lawfully cause the defendants to be **568 brought into court even if he had a good cause of action against them. Incapacity to sue is not the same as insufficiency of facts to sue upon" ( Ward v. Petrie, 157 N.Y. 301, 311, 51 N.E. 1002 [1898] ).
Capacity is defined as "the satisfaction of a legal qualification, such as legal age or soundness of mind, that determines one's ability to sue or be sued" (Black's Law Dictionary [10th ed. 2014], capacity). Capacity concerns "a litigant's power to appear and bring its grievance before the court" ( Community Bd. 7 of Borough of Manhattan v. Schaffer, 84 N.Y.2d 148, 155, 615 N.Y.S.2d 644, 639 N.E.2d 1 [1994] ). "Capacity may depend on a litigant's status or ... on authority to sue or be sued" ( Silver v. Pataki, 96 N.Y.2d 532, 537, 730 N.Y.S.2d 482, 755 N.E.2d 842 [2001] ). The capacity of governmental entities to sue can be either express or implied (see 84 N.Y.2d at 155-156, 615 N.Y.S.2d 644, 639 N.E.2d 1 ["Being artificial creatures of statute, (governmental) entities have neither an inherent nor a common-law right to sue. Rather, their right to sue, if it exists at all, must be derived from the relevant enabling legislation or some other concrete statutory predicate"] ). Thus, where the power to sue is expressly granted, an entity has capacity to sue or be sued; no further inquiry is required.
Here, there is no question that the Battery Park City Authority (BPCA) has the capacity to sue and be sued. Its enabling legislation specifically grants it that power, unlike the community board in Community Bd. 7, which lacked any express statutory authority to sue or be sued (compare Public Authorities Law § 1974[1] [expressly providing that the BPCA "shall ***408 have power" "(t)o sue and be sued"], with Community Bd. 7 at 157, 615 N.Y.S.2d 644, 639 N.E.2d 1 ["neither New York City Charter § 2800 nor the relevant ULURP provisions expressly authorize community boards to bring suit"] ). Indeed, if the BPCA lacked legal capacity, this lawsuit would not exist, and Jimmy Nolan's Law-which extended the statute of limitations for actions against a public corporation-would have been futile.
Whether a natural person or artificial entity may sue or be sued is a question of capacity. Whether a governmental entity may sue to challenge a governmental action could properly be thought of as one of general justiciability, but equally could be expressed as one of standing, which is the way most of our decisions have framed it. Standing has two components: a jurisdictional component, so that if a party suffers no injury, it may not sue; and a prudential component, involving "rules of self-restraint," which includes the determination that a party is well-situated to bring an action on its own or on behalf of another (see Society of Plastics Indus. v. County of Suffolk, 77 N.Y.2d 761, 773, 570 N.Y.S.2d 778, 573 N.E.2d 1034 [1991] [explaining the "prudential limitations" of standing include *1249 "a general prohibition on one litigant raising the legal rights of another; a ban on adjudication of generalized grievances more appropriately addressed by the representative branches; and the requirement that the interest or injury asserted fall within the zone of interests protected by the statute invoked"] ). We have cautioned that "the concept of capacity is often confused with the concept of standing, but the two legal doctrines are not interchangeable," and that "[t]he concept of a lack of capacity ... has also occasionally been intermingled with the analytically distinct concept of a failure to state a cause of action" ( Community Bd. 7, 84 N.Y.2d at 154-155, 615 N.Y.S.2d 644, 639 N.E.2d 1 ), yet we sometimes have failed to heed our own warnings.
In the context of challenges brought by legislatively-created entities to actions of **569 the legislature, we have usually described the issue as one of "power," "standing," or "status," rather than "capacity." The occasional imprecise introduction of the word "capacity" is traceable to a quirk of jurisdiction evident in County of Albany v. Hooker, 204 N.Y. 1, 97 N.E. 403 (1912), which was adopted many years later in City of New York v. State of New York, 86 N.Y.2d 286, 289, 631 N.Y.S.2d 553, 655 N.E.2d 649 (1995). In Hooker, the Appellate Division certified a question for appeal, casting it as: "Has the county of Albany legal capacity to bring this action?" Explaining that our court's "jurisdiction is restricted to a review of that question," we painstakingly noted that the "Revised ***409 Statutes of 1829 ... provided: 'Each county, as a body corporate, has capacity ... To sue and be sued in the manner prescribed by law"; and the Constitution of 1846 "provided that 'All corporations shall have the right to sue, and shall be subject to be sued in all courts, in like cases, as natural persons.' And such provision was continued in the Constitution of 1894"; and finally, that by statute, "A county is a municipal corporation." ( 204 N.Y. at 9-11, 97 N.E. 403.) After emphasizing the capacity of counties to sue and be sued, Hooker held that "the action cannot be maintained by the plaintiff, and the wrong, if any, created and existing by the acts of the legislature, must be corrected by the legislature" ( id. at 18, 97 N.E. 403 ). Hooker rested on the proposition that counties, like "the several towns[,] are political divisions, organized for the convenient exercise of the political power of the state; and are no more corporations than the judicial, or the senate and assembly districts" (id., quoting Lorillard v. Town of Monroe, 11 N.Y. 392, 394 [1854] ).[1]
Most of the decisions cited by the majority do not express the underlying issue as one of capacity. In Matter of County of Cayuga v. McHugh, 4 N.Y.2d 609, 176 N.Y.S.2d 643, 152 N.E.2d 73 (1958), Cayuga County sued the State Commission of Correction. We did not mention capacity; instead, we reached the merits and held that the Commission's action was not arbitrary ( *1250 id. at 613, 176 N.Y.S.2d 643, 152 N.E.2d 73 ). In Town of Black Brook v. State of New York, 41 N.Y.2d 486, 489, 393 N.Y.S.2d 946, 362 N.E.2d 579 (1977), there is likewise no mention of the town's capacity to sue; we determined that the town had "standing" to pursue its claim against the State. In Village of Herkimer v. Axelrod, 58 N.Y.2d 1069, 1071, 462 N.Y.S.2d 633, 449 N.E.2d 413 (1983), we held that a municipal hospital lacked "standing" to sue the State Department of Health; again, there is no mention of the hospital's lack of capacity.
As the majority notes, the case most closely analogous to the present matter, Black Riv., speaks only in terms of "status,"
***410 "standing" or "power," not capacity.[2] The majority concludes that Black **570 Riv., despite discussing standing and not capacity, was really about capacity and involved "no real issue of 'standing,' " because the District's condemnation proceeding against a private landowner would have been unlawful unless the District obtained a declaration that the Stokes Act was unconstitutional. To the contrary, the District clearly had the power to sue and be sued-else it could not have brought a condemnation proceeding irrespective of the Stokes Act's constitutionality. Moreover, our detailed rationale does not mention the inability of the District to sue or be sued, but rather the District's lack of standing to challenge an act of the legislature, which is supreme over it: "Inherent in the grant of legislative power is the plenary power to alter or revoke.... The interests of the plaintiffs then are only those of the State and the State cannot challenge its own acts" ( 307 N.Y. at 489, 121 N.E.2d 428 ). The District had no injury-in-fact from the Stokes Act, because the District itself could be eliminated or altered by legislative command.
The Appellate Division cases cited by the majority are largely in accord with our prior decisions, treating the issue as one of standing. Matter of Town of Moreau v. County of Saratoga, 142 A.D.2d 864, 531 N.Y.S.2d 61 (3d Dept.1988), County of Rensselaer v. Regan, 173 A.D.2d 37, 578 N.Y.S.2d 274 (3d Dept.1991), affd. 80 N.Y.2d 988, 592 N.Y.S.2d 646, 607 N.E.2d 793 (1992), and City of Buffalo v. State Bd. of Equalization & Assessment, 26 A.D.2d 213, 272 N.Y.S.2d 168 (3d Dept.1966) discuss the issue in terms of standing only, not capacity. The two Appellate Division cases cited by the majority that do characterize the issue as one of capacity, Matter of New York Blue Line Council, Inc. v. Adirondack Park Agency, 86 A.D.3d 756, 927 N.Y.S.2d 432 (3d Dept.2011) and Matter of County of Nassau v. State of New York, 100 A.D.3d 1052, 953 N.Y.S.2d 339 (3d Dept.2012), were decided after City of New York, and repeat the wayward "capacity" language therein.
What the relevant cases have in common-and as to this, I believe the majority and I agree-is that the restriction on governmental entities challenging legislative action derives ***411 from the intrinsic structure of our government and separation of powers concerns. The legislative branch has the power to create entities (including public benefit corporations) to carry out its functions; the legislature also has the power to change, affect, and even eliminate those entities entirely. Because it is within the legislature's plenary power *1251 to do so, the courts generally have no role in determining the wisdom of legislative enactments regarding those entities. Judicial restrictions based on the separation of powers usually implicate justiciability, not capacity (see Matter of New York State Inspection, Sec. & Law Enforcement Empls., Dist. Council 82, AFSCME, AFL-CIO v. Cuomo, 64 N.Y.2d 233, 239, 485 N.Y.S.2d 719, 475 N.E.2d 90 [1984] ; Matter of Korn v. Gulotta, 72 N.Y.2d 363, 381, 534 N.Y.S.2d 108, 530 N.E.2d 816 [1988] ; see also Jiggetts v. Grinker, 75 N.Y.2d 411, 415, 554 N.Y.S.2d 92, 553 N.E.2d 570 [1990] ["policy choices ... are matters for the executive and legislative branches of government and the place to question their wisdom lies not in the courts but elsewhere"] ). Indeed, the issue here is as much one of justiciability as of standing: **571 in the ordinary case, the judiciary would not interfere in a legislative decision to eliminate, modify or impair an entity of its own creation. It is not our function to second-guess the wisdom of legislation that adversely affects only a legislatively-created entity. The majority explains that the rationale for the so-called "capacity bar" reflects concerns of "judicial restraint" and "governmental and public policy," and that the "capacity bar closes the courthouse doors to internal political disputes between the State and its subdivisions." Those principles, by their own words, implicate standing and justiciability, not capacity.
II.
I would tackle the certified question in stages. First, as the majority notes, we need to reformulate the question asked by the United States Court of Appeals for the Second Circuit, because the issue is much more specific than when a public benefit corporation should be treated like the State. Second, under the majority's test or mine, there is a "particularized inquiry," in the sense of an examination of facts particular to the entity's ability to sue and be sued (capacity) and its injury-in-fact and prudential concerns (standing and justiciability to me; capacity to the majority), but those are not the "particularized inquiry" of John Grace & Co. v. State Univ. Constr. Fund, 44 N.Y.2d 84, 88, 404 N.Y.S.2d 316, 375 N.E.2d 377 (1978). Third, the Second Circuit has invited us to indicate how this particular case should be resolved, and I would accept that invitation.
***412 A.
The cases identified by the Second Circuit in the first certified question, John Grace & Co. and Clark-Fitzpatrick, Inc. v. Long Is. R.R. Co., 70 N.Y.2d 382, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987), are not germane to the question of whether a public benefit corporation can challenge a legislative act as unconstitutional. I agree with the majority on this. Clark-Fitzpatrick holds that punitive damages are not available against public benefit corporations, and John Grace & Co. holds that a statute giving contractors relief from fuel cost spikes during the energy crisis did not apply to contracts with public authorities, but was limited to contracts with the State itself. Those cases do not relate to the power of public benefit corporations to sue or be sued, or under what circumstances they might be able to challenge an act of the State. I would reformulate the certified question to ask whether and under what circumstances a public benefit corporation can challenge a statute as unconstitutional.
B.
Putting aside the labels of "standing," "status," "power," or "capacity" used in our decisions and the decisions of the lower courts, the case law can be distilled into the following propositions. First, the general rule is that a legislatively-created artificial *1252 entity cannot challenge an action of the legislature, because that entity is a creature of the legislature, the legislature is vested with lawmaking authority, and the legislature may abolish or alter its creatures at will (see Black Riv. at 487, 121 N.E.2d 428 ["The number and nature of (the regulating district's) powers are within the State's absolute discretion and any alteration, impairment or destruction of those powers by the Legislature presents no question of constitutionality"] ). In that sense, those subordinate legislative creations have no cognizable injury resulting from legislative action, because our system of government vests the lawmaking power in the legislature, not to be challenged by subordinate entities, whether those are municipalities, public authorities, public **572 benefit corporations, or otherwise. Second, there are circumstances in which the general rule can be overcome. Those fall into two basic categories: (A) when the State Constitution grants a right specific to the subordinate governmental unit, that unit may challenge legislative action as violative of the specific constitutional grant to it (see e.g. Town of Black Brook v. State of New York, 41 N.Y.2d 486, 489, 393 N.Y.S.2d 946, 362 N.E.2d 579 [1977] ["When, indeed, ***413 a local government's claim is based on one of the protections of article IX (the Municipal Home Rule Law), the principle underlying the otherwise general rule prohibiting it from questioning legislative action affecting its powers is no longer applicable"] ); and (B) when the challenged legislative action impairs the rights of a third party, and the subordinate governmental unit is both affected and in a good position to bring the claim when compared to other potential litigants, that unit may challenge the legislative action (see e.g. Patterson v. Carey, 41 N.Y.2d 714, 724, 395 N.Y.S.2d 411, 363 N.E.2d 1146 [1977] [allowing the Jones Beach Parkway Authority to challenge section 153-c of the Public Authorities Law as violating the portions of the New York Constitution setting forth the Comptroller's powers] ).
In category (A), the traditional concerns of standing are satisfied: the injury to the subordinate entity is direct and the right constitutionally guaranteed to it. In category (B), the concerns animating prudential standing come into play: there must be some actual injury to the subordinate governmental entity, but that alone is not sufficient; the courts must determine as a matter of prudence whether it is appropriate for the entity to bring the suit, taking into account the strong presumption that legislatively-created entities cannot challenge legislative actions (see Black Riv. at 488, 121 N.E.2d 428 ["The concept of the supreme power of the Legislature over its creatures has been respected and followed in many decisions"] ) and the "general prohibition on one litigant raising the legal rights of another" ( Society of Plastics, 77 N.Y.2d at 773, 570 N.Y.S.2d 778, 573 N.E.2d 1034 ). Generally, if the third parties are the better-suited litigants, then the entity would not have standing to sue. However, sometimes the entity will be the better-suited litigant, and standing doctrine allows suit in those instances. In this regard, the inquiry is necessarily case-specific, and could be characterized as "particularized." Even the consideration of the applicability of the majority's four exceptions drawn from City of New York is case-specific-as is each of our prior decisions and of the decisions of the lower courts. Those same factors would figure into the determination if the issue was framed as one of justiciability rather than standing: a claim by a legislatively-created entity purporting to challenge a statute should not be justiciable if there is no specific constitutional guarantee to that entity and the only injury is to the entity itself, or the injury is to some third party who is better suited to bring the claim on its own behalf.
*1253 Our case that best encompasses the above structure is Patterson v. Carey, 41 N.Y.2d 714, 395 N.Y.S.2d 411, 363 N.E.2d 1146 (1977). The Jones Beach Parkway ***414 Authority raised the parkway toll from 10¢ to 25¢, and the State enacted legislation repealing the toll. The Jones Beach Parkway Authority and the trustee for bondholders sued the State, challenging the legislation as unconstitutional. Although the decision does not expressly delineate between plaintiffs and claims, the structure of the decision does so quite clearly. As to the claims that the legislation unconstitutionally impaired the Authority's finances and with it, the value of the bonds, we were silent as to the impairment **573 of the Authority's finances, focusing exclusively on the bondholders' rights when finding the statute unconstitutional (see id. at 720-722, 395 N.Y.S.2d 411, 363 N.E.2d 1146 ). In contrast, when addressing the claim that the legislation's restriction on the State Comptroller's procedures for auditing the Authority encroached on the Comptroller's constitutional authority, we focused exclusively on the Authority's claim (see id. at 723-725, 395 N.Y.S.2d 411, 363 N.E.2d 1146 ). Implicitly, we determined that the Authority did not have standing to pursue the claims relating to impairment of its finances, though the bondholders did, and the Authority had sufficient standing to challenge the statute's restriction of the Comptroller's auditing powers, because the Authority was affected by the restrictions and well-suited to challenge them. The majority, too, understands Patterson as a decision about standing, not capacity.
The four exceptions set out in City of New York are an application of the above principles in the context of municipal corporations, which-unlike public benefit corporations-have constitutional protections running directly to them. For that reason, however unlikely it is that a county, city, town or village would be able to challenge a legislative action, the possibility that a public benefit corporation would be able to do so is substantially more remote.
C.
Unlike the majority, I would accept the Second Circuit's invitation to provide "specific guidance ... as to the appropriate result of the inquiry in this particular case" (In re World Trade Ctr. Lower Manhattan Disaster Site Litig., 846 F.3d 58, 70 [2d Cir.2017], certified question accepted 28 N.Y.3d 1159, 49 N.Y.S.3d 89, 71 N.E.3d 581 [2017] ). It is uncommon for the Second Circuit to suggest that we provide guidance as to the proper disposition of a case before it, but in this case, the Second Circuit's suggestion makes eminent sense. The legislature made a choice, in the wake of an unprecedented terrorist attack, to extend the statute of limitations ***415 for claims brought by first responders. The questions here purely concern New York public policy surrounding relief efforts in the wake of that attack-including what future first responders might expect from the legislature; the structure of New York State government; and the power of the New York State Legislature. Those are not in any sense federal questions, and relate powerfully to New York's status as a sovereign state. As implicitly recognized by the Second Circuit's invitation, New York State has an overriding interest in deciding the lawfulness of Jimmy Nolan's Law, which indisputably complies with the Due Process Clause of the Fourteenth Amendment.
I cannot speak for the majority. Whether thought of as "capacity," "justiciability" or "standing," I believe the clear result here is that the BPCA may not challenge the constitutionality of Jimmy Nolan's Law. No constitutional protection runs directly to the BPCA entitling it to *1254 avoid claim-revival statutes, the BPCA does not seek to vindicate the constitutional rights of others and, even if it did, there is no showing that it would be better situated to vindicate those rights than the third parties would be.
Chief Judge DiFIORE and Judges RIVERA, STEIN, FAHEY and GARCIA concur, Judge RIVERA in a concurring opinion; Judge WILSON concurs in a separate concurring opinion.
Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the questions **574 by this Court pursuant to section 500.27 of this Court's Rules of Practice, and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, first certified question answered in the negative and second certified question, as reformulated, answered in accordance with the opinion herein.

Although it might be tempting to read Hooker as suggesting that counties have capacity to sue in their proprietary role but not in their governmental role, that reading is unsatisfactory, because counties can be sued in their governmental role, and can sue private citizens while acting in their governmental role. Hooker must be understood in its jurisdictional posture, where this Court, constrained to answer the question posed by the Appellate Division without the ability to reformulate it to remove the word "capacity," "assumed that by the question submitted it is intended that this court shall determine whether the county has capacity to maintain the particular action stated in the complaint" (204 N.Y. at 9, 97 N.E. 403 [emphasis added] ). That emendation, though restating the word "capacity," emphasizes that the court's rule is claim-specific, meaning it is not one of capacity, but of standing, justiciability or existence of a cause of action.

In Black Riv., the Black River Regulating District challenged the Stokes Act as unconstitutional. We held that
"the plaintiffs are without power to challenge the validity of the act or the Constitution ...
"The issuance of certificates of indebtedness does not confer upon plaintiffs an independent status by which they have standing, either as a body politic or as individuals, to test the validity of the Stokes Act" (307 N.Y. at 489, 121 N.E.2d 428).